15-1214

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

_____

## DYNAMIC DRINKWARE, LLC
Appellant,


v.


## NATIONAL GRAPHICS, INC.
Appellee

_____

Appeal from United States Patent and Trademark Office
Proceeding No. IPR 2013-00131
Patent 6,635,196

_____

## APPELLANT'S BRIEF

_____

DAVIS & KUELTHAU, s.c.

Joseph S. Heino, WI SBN 1003931
Matthew R. McClean, WI SBN 1041470
Patrick Bergin, SBN 1037754
111 East Kilbourn Avenue, Suite 1400
Milwaukee, WI 53202
(414) 276-0200

February 27, 2015

Form 9

FORM 9.  Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Dynamic Drinkware, LLC        v. National Graphics, Inc.

No. 15-1214

### CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Appellant                    certifies the following (use "None" if applicable; use extra sheets
if necessary):

1.      The full name of every party or amicus represented by me is:

Dynamic Drinkware, LLC

2.      The name of the real party in interest (if the party named in the caption is not the real
party in interest) represented by me is:

None

3.      All parent corporations and any publicly held companies that own 10 percent or more
of the stock of the party or amicus curiae represented by me are:

None.

4.  ☑  The names of all law firms and the partners or associates that appeared for the party
or amicus now represented by me in the trial court or agency or are expected to appear in this
court are:

Davis & Kuelthau, s.c.; Matthew R. McClean; Patrick M. Bergin; Joseph S. Heino

2/27/15                              s/Matthew R. McClean
        Date                              Signature of counsel

                                    Matthew R. McClean
                                         Printed name of counsel

Please Note: All questions must be answered
cc: All counsel of record

Reset Fields

124

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF RELATED CASES ................................................ vi

I.    STATEMENT OF JURISDICTION ............................................. 1

II.   STATEMENT OF THE ISSUES .................................................. 1

III.  STATEMENT OF THE CASE ..................................................... 3

     A.   Background of the Technology ............................................. 3

     B.   The Prior Art Reference ...................................................... 4

     C.   The IPR and Procedural Posture ........................................ 5

         1.   Preliminary Proceedings ............................................. 5

         2.   Review Proceedings .................................................... 6

         3.   The Board's Final Decision ......................................... 7

IV.  SUMMARY OF THE ARGUMENT .......................................... 8

V.   ARGUMENT .............................................................................. 9

     A.   Standard Of Review ............................................................ 9

     B.   Raymond Was Valid Prior Art, Entitled to its Provisional Filing Date, and Therefore NGI had the Burden to Refute .......................... 10

         1.   An Issued Patent Claiming Priority to a Provisional Application, Such as Raymond, Is Prior Art Under 35 U.S.C. § 102(e) as of the Date the Provisional Application was Filed .................................................. 10

         2.   The Board Failed to Apply a Burden of Production for a § 112 Challenge to NGI .................................... 11

             i.   The Shifting Burden of Production ..................... 12

ii.    NGI Had the Burden to Produce Evidence to
Antedate Raymond ................................................................14

3.    The Board Misread *Giacomini* and *Yamaguchi* and Thereby
Misapplied the Burden..................................................................14

i.    The *Giacomini* Case............................................................15

ii.    The *Yamaguchi* Case .........................................................16

iii.    Correctly Applied, *Giacomini* and *Yamaguchi* Support
Dynamic's Position...............................................................17

4.    The Fundamental Principle of "First to Invent"
Favors Reversal ............................................................................18

C.    In the Alternative, Dynamic Provided Sufficient Evidence and
Argument That the Raymond Provisional Provided Written
Description Support For the Raymond Patent ....................................19

1.    Dynamic's Claim Chart Establishes Anticipation of Claim 1
of the '196 Patent by the Raymond Provisional...........................19

2.    The Record Allows For a Full Correspondence
Between the Raymond Patent, the Raymond Provisional
and the '196 Patent ......................................................................21

3.    A Separate Chart for Claim 12 Was Unnecessary Because
of NGI's Response.......................................................................25

VII.  CONCLUSION ..........................................................................................27

PROOF OF SERVICE.........................................................................................29

CERTIFICATE OF COMPLIANCE...................................................................30

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Alexander Milburn Co. v. Davis-Bournonville Co.*,
270 U.S. 390 (1926) ............................................................................18

*Cooper v. Goldfarb*,
154 F.3d 1321 (Fed.Cir.1998) ...........................................................14

*Creative Compounds, LLC v. Starmark Labs.*,
651 F.3d 1303 (Fed. Cir. 2011) ..........................................................14

*Director, Office of Workers' Comp. Programs, Dept. of Labor v. Greenwich Collieries*,
512 U.S. 267 (1994) ............................................................................12

*Environ Prods., Inc. v. Furon Co.*,
215 F.3d 1261 (Fed.Cir.2000) ...........................................................14

*Ethicon, Inc. v. U.S. Surgical Corp.*,
135 F.3d 1456 (Fed. Cir. 1998) .................................................. 10, 28

Ex Parte *Yamaguchi*,
88 U.S.P.Q. 2d 1606, 2008 WL 4233306 (BPAI Aug. 29, 2008)........17

*Falko-Gunter Falkner v. Inglis*,
448 F.3d 1357 (Fed. Cir. 2006) ..........................................................10

*In re Gartside*,
203 F.3d 1305 (Fed. Cir. 2000) ..........................................................10

*In re Giacomini*,
612 F.3d 1380 (Fed. Cir. 2010) ................................................. Passim

*Innovative Scuba Concepts, Inc. v. Feder Indus, Inc.*,
26 F.3d 1112 (Fed. Cir. 1994) ............................................................13

*Mahurkar U.C.R. Bard, Inc.*,
79 F.3d 1572 (Fed. Cir. 1996) .................................................... 13, 15

*Panduit Corp. v. Dennison Mfg. Co.*,
810 F.2d 1561 (Fed. Cir. 1987) ..........................................................26

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
522 F.3d 1299 (Fed. Cir. 2008) ..........................................................14

*Price v. Symsek*,
988 F.2d 1187 (Fed. Cir. 1993) .................................................... 10, 20

*Technology Licensing Corp. v. Videotek, Inc.*,
545 F.3d 1316 (Fed. Cir. 2008) ........................................... 12, 13, 15

## Statutes

5 U.S.C. § 706 ........................................................................... 10, 26, 28

28 U.S.C. § 1295(a)(4)(A) ...................................................................1

35 U.S.C. § 102(e)(2) ................................................................... 1, 10

35 U.S.C. § 102(e) ...................................................................... Passim

35 U.S.C. § 111(b)(8) ..................................................................... 1, 11

35 U.S.C. § 112 ........................................................................... Passim

35 U.S.C. § 119(e)(1) ................................................................ 2, 10, 11

35 U.S.C. § 316(e) ...........................................................................12

35 U.S.C. § 329 .................................................................................1

35 U.S.C. § 6 ....................................................................................1

## Regulations

37 C.F.R § 41.121(b) .......................................................................14

37 C.F.R. § 42.20 ............................................................................12

## Other

Christopher B. Mueller & Laird C. Kirkpatrick, Evidence § 3.1 (1995) .................12

21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice &
   Procedure § 5122 (2d ed.2005). ........................................................12

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), Appellant states as follows:

(a)  There have been no previous appeals in this proceeding.

(b)  Appellant is a defendant in the case captioned *National Graphics, Inc. v. Brax Ltd.*, Case No. 12-C-119 (E.D. Wis).

# I.    STATEMENT OF JURISDICTION

The Patent Trial and Appeal Board ("the Board") had jurisdiction over Appellant, Dynamic Drinkware, LLC's ("Dynamic") petition for *Inter Partes* Review under 35 U.S.C. § 6.  The Board issued a Final Written Decision on September 12, 2014.  Dynamic timely filed its notice of appeal on November 13, 2014.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 329.

# II.    STATEMENT OF THE ISSUES

The question presented is whether the Board erred by not placing the burden to produce evidence to counter the cited prior art's established effective date on Appellee, National Graphics, Inc., as the junior patentee. Following both statutory and case law analysis, the answer to the question presented should be "yes."  Part of the inquiry must consider whether, in an *Inter Partes* Review proceeding evaluating 35 U.S.C. § 102(e)(2), a patent reference is entitled to the filing date of a provisional application as a matter of law.  Fundamentally, an applicant is not entitled to a patent if the claimed invention was disclosed in another's patent issued from an earlier filed U.S. "application for patent."  35 U.S.C. § 102(e)(2).  And, 35 U.S.C. § 111(b)(8) requires that provisional applications be treated the same as non-provisional applications for all sections of the Patent Act except the listed

1

exceptions, which do not include § 102(e).  Ultimately, the first inventor should be awarded the patent.

In its Decision, the Board did not credit the prior art's provisional filing date because it misapplied the burden of proof. Instead of requiring Patent Owner-Appellee to overcome the presumed priority date of the Raymond patent, the Board placed the burden of proving entitlement to the priority date on the Petitioner-Appellant, Dynamic.  The error permits an invalid patent.

This Court must reverse the Decision of the Board based on *In re Giacomini*, 612 F.3d 1380 (Fed. Cir. 2010), uphold the basic rule that a non-provisional application is treated as though filed on the filing date of the provisional application to which it claims priority, 35 U.S.C. 119(e)(1), and then apply the prior art date against the Appellee patent at issue.

Alternatively, if the Court believes the Board correctly applied the law and the corresponding burden of proof, the Court should still reverse the Decision of the Board. Thus, the secondary question is whether the Board clearly erred by not finding that Dynamic came forward with sufficient and unrefuted evidence to prove that the Raymond provisional application provides sufficient written description support for the Raymond patent under 35 U.S.C. § 112. Based on the record, the answer is "yes."

## III.   STATEMENT OF THE CASE

Dynamic filed a petition for an *Inter Partes* Review ("IPR") of the independent claims of U.S. Patent No. 6,635,196 entitled "Molded articles having a surface bearing a lenticular image" (the "'196 patent"; A123-A135). Dynamic's petition for IPR was granted as to claims 1 and 12. (A192). The Board's Final Decision found that Dynamic failed to meet its burden that claims 1 and 12 of the '196 patent were anticipated by the prior art reference cited. (A121).

### A.   <u>Background of the Technology</u>.

Appellee, National Graphics, Inc. ("NGI"), is the owner of the '196 patent issued to Goggins. (A123). The '196 patent discloses a method for creating an injection molded article having a lenticular image. (A129 at 1:8-14). Injection molding involves forcing molten plastic into a rigid mold press. (A131 at 5:33-36). A lenticular image typically includes a lenticular lens and an image that is printed directly on the back of the lens or on a substrate that is attached to the lens. (A130 at 3:56-66). In order to form an injection molded article containing a lenticular image, the lenticular image is held within the mold while the plastic is injected around it. (A131 at 5:47-50). The molten plastic is then cooled to form a plastic article with a lenticular image. (A131 at 5:36-38). Maintaining the integrity of both the lenticular lens and the image during the injection molding process is of critical importance. Degradation of either the lenticular lens or of the

3

lenticular image can reduce or even destroy the effectiveness of the lenticular image.  (A131 at 5:56-60).

The '196 patent purports to invent a process for creating a molded lenticular article that minimizes degradation of the ink image and distortion of the lenticular lens.  To do so, the claims of the '196 patent require that the molten plastic be "introduced at at least one of a temperature, a pressure, and a turbulence that minimizes any distortion to the lenticular lens and any degradation to the interlaced image, pressure and/or turbulence."  (A133 at 10:41-49).

### B.    The Prior Art Reference.

The prior art involved is U.S. Patent No. 7,153,555 ("the '555 Patent" or the "Raymond Patent"), entitled "Plastic objects including lenticular lens sheets," which issued to Raymond on December 26, 2006 and is owned by Travel Tags, Inc.  (A157-A174).   The Raymond patent discloses a lenticular product that employs a thermal protective substrate layer adhered to the back of the lenticular lens over the ink to prevent damage to the ink layer and to promote bonding between the plastic container and the lenticular image.  (A165 at 4:28-37).   Its solution to the two problems, i.e., (1) destruction or alteration of the ink layer and (2) the inability to effectively bond the ink layer to the plastic, involves "applying and/or bonding a protective substrate to and over the ink layer of the lenticular

4

insert prior to inserting the lenticular insert into the mold cavity for plastic molding of the plastic object." (A165 at 4:65-5:3).

The '196 patent was filed on November 22, 2000 and claims priority to a provisional application filed on June 12, 2000. (A123). The Board concluded that NGI had demonstrated by a preponderance of the evidence that NGI reduced the invention to practice by March 28, 2000. (A118-A119). The Raymond patent was filed on May 5, 2000, but it claims priority to a provisional application filed on February 15, 2000. (A157).

By failing to dispute that Raymond teaches all of the features of the '196 patent, NGI conceded the issue. (Patent Owner Response, *passim*). NGI has never argued that the Raymond provisional lacked written description support for the Raymond Patent. Moreover, at no time has NGI claimed a reduction to practice date earlier than March 28, 2000, which is more than one month after the filing date of the Raymond provisional application.

### C.    <u>The IPR and Procedural Posture</u>.

#### 1.    **Preliminary Proceedings.**

On November 2, 2012, NGI brought a patent infringement claim against Dynamic and others on seven patents, including the '196 patent, in the Eastern District of Wisconsin. (Petition for *Inter Partes* Review, p. 2). On February 1, 2013, Dynamic filed a petition for IPR of claims 1, 8, 12 and 15 of the '196 patent

5

under the Leahy-Smith America Invents Act.  (Id., p. 3).  Dynamic included a claim chart for the '196 patent, the Raymond patent, and the Raymond publication reference.  U.S. Pub. No. 2004/0157011.  (Id., pp. 14-27).

On July 30, 2013, NGI filed a preliminary response in opposition to the petition.  In the preliminary response, NGI argued that the '196 patent was distinguishable over the Raymond patent because the protective substrate of Raymond is not necessary to maintain the integrity of the ink layer.  (NGI Preliminary Response, p. 8).  Rather, under the claims of the '196 patent, NGI asserted that it maintains the integrity of ink layer by controlling the temperature, pressure, and turbulence at which the plastic is injected into the mold.  (Id., pp. 8-9).  NGI further argued that the '196 patent improves over the Raymond patent by eliminating the extraneous manufacturing step of applying a protective substrate to the ink layer.  (Id., p. 9)  On October 28, 2013, the Board rejected NGI's attempt to distinguish its patent and found that the Raymond patent was reasonably likely to anticipate claims 1 and 12.  (A189, A192)  The Board instituted review of claims 1 and 12 under 35 U.S.C. § 102(e).  (A192).

## 2.    Review Proceedings.

On January 24, 2014, NGI filed its Patent Owner Response and a Contingent Motion to Amend.  In its response, NGI abandoned its effort to argue that the '196 patent was patentable over Raymond.  (Patent Owner Response, *passim*).  Instead,

for the first time, NGI attempted to antedate Raymond's May 5, 2000 utility application date.  (Id., pp. 7-17).  NGI's argument for disregarding the February filing date of the Raymond provisional was limited to waiver based on the provisional application having not been filed with Dynamic's petition.  (Id., p. 4-7).  In Dynamic's May 6, 2014 reply, it included the Raymond provisional, provided a claim chart comparing the '196 and the Raymond provisional, and summarized the support in the Raymond provisional for a rejection of the '196 under 35 U.S.C. § 102(e).  (Petitioner's Reply to Patent Owner Response, pp. 4-7).  A hearing was held before the Board on July 24, 2014.  At oral argument, both parties asserted that the other had the burden regarding the Raymond provisional application.  (Oral Hrg. Tr., p. 40, 66).

### 3.    The Board's Final Decision.

The Board issued its Decision on September 12, 2014, determining that Dynamic failed to demonstrate that claims 1 and 12 of the '196 patent were invalid.  (A121).  The Board found that NGI reduced to practice its invention by March 28, 2000, before the May 5, 2000 filing date of the Raymond utility application. (A120).  In its analysis, the Board concluded that Dynamic failed in its burden to prove that Raymond was entitled to the benefit of its February 15, 2000 provisional filing date.  (A107).  The Board cited two problems with Dynamic's evidence:  (1) Dynamic did not present a chart that compared the portions of

Raymond's patent to the Raymond provisional to demonstrate that those portions were carried over from the provisional; and (2) that Dynamic did not include a chart for claim 12.  (A106-A107).

## IV.  SUMMARY OF THE ARGUMENT

The Board misconstrued the relative burdens of proof for the parties' competing positions in this case by requiring Dynamic to prove entitlement to the Raymond priority date. Subsequently, the Board either overlooked the available evidence or elevated form over substance in finding Dynamic failed to meet the improperly applied burden.  As a result, the Board's Decision disregards the fundamental rule that the patentee must be the first inventor, and abrogates the established process for a junior party to antedate prior art in patent proceedings. This Court should reverse the Board's Decision and invalidate claims 1 and 12 of the '196 patent.

NGI does not dispute that the Raymond patent discloses all of the limitations of the claims at issue.  Rather, in its opposition, NGI argued that the Raymond patent should not be available prior art because Dynamic waived the benefit of the filing date of the Raymond provisional application.  (Patent Owner Response, pp. 3-6).  It is well established, however, that a patent is prior art as of its effective filing date, provided that the disclosure of the prior application provides sufficient written description support under 35 U.S.C.§ 112.  *In re Giacomini*, 612 F. 3d

1380 (Fed. Cir. 2010).[1]  In this IPR, the Board put the burden on Dynamic to prove that the Raymond provisional application contained written description support for the Raymond patent, rather than on NGI, the party attempting to swear behind Raymond.  This was wrong as a matter of law.

Even if the Court agrees that Dynamic bore the burden on the priority issue, the Board clearly erred by disregarding  Dynamic's direct and undisputed evidence that Raymond's provisional application provided written description support for the Raymond patent.

## V.    ARGUMENT

### A.    <u>Standard Of Review</u>.

This United States Court of Appeals for the Federal Circuit reviews the Board's conclusions of law *de novo* and its findings of fact for clear error, pursuant to 5 U.S.C. § 706. The determination of patent priority is a question of law to be determined based upon underlying factual determinations.  *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed. Cir. 1993). Questions of law are reviewed *de novo*.  *In re Gartside*, 203 F.3d 1305, 1315 (Fed. Cir. 2000).  The factual findings are reviewed for clear error,  *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998), and must be supported by "substantial evidence." *Falko-Gunter*

---

[1] *See also* Petitioner's Reply to Patent Owner-Response, p. 3 (regarding the advent of Public PAIR as it relates to the waiver argument).

*Falkner v. Inglis*, 448 F.3d 1357, 1363-64 (Fed. Cir. 2006). This appeal implicates both mistakes of law and erroneous factual findings.

**B.**     <u>**Raymond Was Valid Prior Art, Entitled to its Provisional Filing Date, and Therefore NGI had the Burden to Refute.**</u>

       **1.**     **An Issued Patent Claiming Priority to a Provisional Application, Such as Raymond, Is Prior Art Under 35 U.S.C. § 102(e) as of the Date the Provisional Application was Filed.**

The plain language of 35 U.S.C. § 102(e)(2), § 119(e)(1) and § 111(b)(8), requires that, in determining a reference's § 102(e) prior art date, the Board must credit a proper claim to an earlier filed provisional application. *Giacomini*, 612 F.3d at 1385. This Court in *Giacomini* reviewed the basis for treating a provisional application the same as a non-provisional application. *Id.* at 1383. Non-provisional applications are treated as though filed on the date of filing of a provisional application to which it claims priority. 35 U.S.C. § 119(e)(1); *Giacomini* 612 F.3d at 1383. Additionally, 35 U.S.C. § 111(b)(8) requires that provisional applications be treated the same as non-provisional applications for all sections of the Patent Act with the exceptions noted (which do not include § 102(e)). Thus, "applications for patent" under section 102 includes both provisional and non-provisional patent applications. *Id*. at 1383.

Simply, if another's patent discloses the same invention, which was carried forward from an earlier U.S. provisional application or U.S. non-provisional

application, then the second applicant should not get a patent. *Id*. Here, under the statutory framework, the Raymond patent's presumed effective date is its February 15, 2000 provisional filing date. (A123; A139-A156). As a valid prior art patent, the Raymond patent should be entitled to its priority date, and all other presumptions applicable to valid patents. However, an important limitation is that the provisional application must provide written description support for the claimed invention. *Giacomini,* at 1383.

## 2. The Board Failed to Apply a Burden of Production for a § 112 Challenge to NGI.

The issue thereby raised was, who had the burden to prove that the NGI conception and reduction to practice of the alleged invention embodied in the '196 patent antedates the Raymond reference? Dynamic agrees it carries the ultimate burden of persuasion on the invalidity of the '196 patent. 37 C.F.R. § 42.20; *Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326-27 (Fed. Cir. 2008), 35 U.S.C. § 316(e). Failure to prove the matter as required by the applicable standard means that the party with the burden of persuasion loses on that point. *Videotek*, 545 F.3d at 1327, *citing* Christopher B. Mueller & Laird C. Kirkpatrick, Evidence § 3.1 (1995); 21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure § 5122 (2d ed.2005). The Board required Dynamic to carry the full burden on all issues. In doing so, it implicitly removed NGI's burden of production on its antedation argument.

11

### i.    The Shifting Burden of Production.

The Supreme Court has wrestled with the terminology and obligations of the "burden of proof," and ultimately, has concluded that there is a "burden of persuasion" and a "burden of production." *Director, Office of Workers' Comp. Programs, Dept. of Labor v. Greenwich Collieries,* 512 U.S. 267, 272-73 (1994). The party with the burden of proof has the burden of persuasion, i.e., the obligation to satisfy the evidentiary standard to prevail on the issue. *Id.* at 274. However, at various times within a case, either party may have the burden of production, i.e. the burden of coming forward with the evidence. *Id.* The same has long been true in patent cases. *See also, Videotek,* 545 F.3d at 1327*; Innovative Scuba Concepts, Inc. v. Feder Indus, Inc.*, 26 F.3d 1112, 1115 (Fed. Cir. 1994).

For example, this occurs in anticipation cases, where the determination of priority includes a shifting burden of production. *Videotek*, 545 F.3d 1327; *See also*, *Mahurkar V.C.R. Bard, Inc.,* 79 F.3d 1572, 1576 (Fed. Cir. 1996) (recognizing the shifting burden). Once a challenger establishes a *prima facie* case of invalidity based on a prior art reference and an apparent earlier effective date, the patentee must come forward and produce evidence to the contrary. *Videotek*, 545 F.3d at 1329. In *Videotek*, the court held that once a party challenging validity has introduced sufficient evidence of prior art that is dated earlier than the apparent filing date of the asserted patent claim, the burden of going forward shifts to the

12

patentee. *Id.* Explicitly rejecting the notion that the party challenging the validity of a patent has the burden of persuasion to prove it was entitled to the earlier filing date, the *Videotek* court stated:

> Carefully read, however, *PowerOasis* says nothing more than, and should be understood to say, that once a challenger (the alleged infringer) has introduced sufficient evidence to put at issue whether there is prior art alleged to anticipate the claims being asserted, prior art that is dated earlier than the <u>apparent</u> effective date of the asserted patent claim, the patentee has the burden of going forward with evidence and argument to the contrary.

*Id.* at 1328-29, *citing PowerOasis, Inc. v. T-Mobile USA, Inc.* 522 F.3d 1299 (Fed. Cir. 2008) (emphasis added).

A shifting burden also arises in patent interference cases. In such cases, the party with a later filing date must come forward with evidence and argument that a patent is not entitled to its effective date. *See* 37 C.F.R. §41.202. "[P]riority of invention goes to the first party to reduce an invention to practice unless the other party can show that it was the first to conceive of the invention and that it exercised reasonable diligence in later reducing that invention to practice." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed.Cir.1998). With respect to the burden of proof, this Court has frequently stated, "[t]he correct standard of proof of priority of invention, as between co-pending interfering patents, is the preponderance of the evidence, the junior patentee bearing the burden of pleading and proving priority." *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d

13

1303, 1310 (Fed. Cir. 2011) citing *Environ Prods., Inc. v. Furon Co.*, 215 F.3d 1261, 1266 (Fed.Cir.2000).

### ii. NGI Had the Burden to Produce Evidence to Antedate Raymond.

There is nothing in the IPR rules that would contradict these well-established principles. To the contrary, 37 C.F.R § 41.121(b) provides that the party filing a motion has the burden of proof to establish that it is entitled to the requested relief. Thus, a petitioner is not simply saddled with the burden on all conceivable points.

In this IPR, Dynamic made a *prima facie* showing that the Raymond patent was prior art to the '196 patent and the Board instituted the IPR. (A192). For NGI, as the junior patentee, to antedate Raymond, it had to either establish an invention date *before* February 15, 2000, or establish an invention date before the May 5, 2000 date of Raymond's utility application *and* successfully challenge the sufficiency of the written description of the Raymond provisional application. *Giacomini,* at 1383. *See also Videotek,* 545 F.3d at 1329; *Mahurkar*, 79 F.3d at 1576-77.

### 3. The Board Misread *Giacomini* and *Yamaguchi* and Thereby Misapplied the Burden.

Rather than applying this straightforward analysis, the Board misread *Giacomini* and found – only after the fact – that it was Dynamic that had to prove it

14

was entitled to rely on the filing date of the Raymond provisional application. In the Final Decision, the Board stated:

> To be entitled to rely on the February 15, 2000 provisional filing date, Petitioner had to establish that it relies on subject matter from Raymond that is present in and supported by its provisional. *In re Giacomini*, 612 F.3d 1380, 1383 (Fed. Cir. 2010).

(A106). Later, the Board stated:

> Petitioner has not provided the analysis of common subject matter required by *Yamaguchi* and *Giacomini*.

(A106). These statements are a misreading of the case law.

### i.    The *Giacomini* Case.

*Giacomini* involved an appeal in which Giacomini's patent application, filed November 29, 2000, was rejected as anticipated under 35 U.S.C. § 102 by U.S. Patent No. 7,039,683 (the "Tran patent"), which was filed December 29, 2000. Giacomini argued that the Tran patent did not qualify as prior art because Giacomini's filing date antedates the Tran patent's filing date. *Giacomini,* 612 F.3d at 1384. Because the Tran patent claimed priority to a provisional application filed September 25, 2000, this Court affirmed the rejection of the Giacomini application. *Id.* at 1385.

While there is no specific discussion of the relative burden of proof and persuasion in *Giacomini*, once the Examiner rejected the claims as being anticipated by Tran, the Board required Giacomini, the junior party challenging the

15

written description support in the Tran provisional application, to establish that the Tran provisional failed to provide written description support for the Tran patent. *Id.* at 1383. Giacomini never argued that the Tran provisional failed to provide written description support for the Tran patent so the Board affirmed the Examiner.

### ii.    The *Yamaguchi* Case.

The Board's interpretation on *Yamaguchi* was also error. (A106). *Yamaguchi* involved an appeal of claims rejected under 35 U.S.C. § 102(e) as being anticipated by U.S. Patent No. 6,596,618 to Naranyan, et al. In *Yamaguchi*, the appellant patent applicant argued that that Naranyan was not available as prior art because the Examiner failed to: (1) provide a copy of the provisional application to applicant; and (2) show how the provisional application provided written description support under 35 U.S.C. § 112. Ex Parte *Yamaguchi*, 88 U.S.P.Q. 2d 1606, 2008 WL. 4233306, *1 (BPAI, Aug. 28, 2008). Unlike this case, Yamaguchi did actually undertake a "cursory review" of the provisional application and noted that "it does not identically track the Naranyan patent." *Id.* at *2.

The Examiner found that the provisional application "clearly shows the same subject matter as applied from the Narayanan et al. patent in the art rejections of the present application." *Id.* at *9. By making this factual finding, the

16

Examiner then shifted the burden to appellants to show why such a factual finding was erroneous.  *Id.* at *10.

The Board held that appellant had not persuaded it of error in the Examiner's finding of Naranyan under 35 U.S.C. § 102(e).  Thus, as in *Giacomini*, the Board placed the burden in connection with challenging the disclosure of the provisional application under 35 U.S.C. § 112 on the junior party/challenger.  Indeed, the Board was so concerned about allowing an invalid patent to pass its scrutiny, it actually generated its own claim chart in affirming the Examiner's rejection of the Yamaguchi application.  *Yamaguchi,* 2008 WL 4233306, *10.

### iii.    Correctly Applied, *Giacomini* and *Yamaguchi* Support Dynamic's Position.

Both *Giacomini* and *Yamaguchi* describe a situation where once a claim has been rejected under 35 U.S.C.§ 102(e), the burden of production shifts to the party challenging the claim of priority to show a lack of sufficient written description in the prior art.  Here, in instituting the IPR, the Board found that Dynamic was "reasonably likely to prevail in in demonstrating that at least one of the challenged claims is not patentable."   (A176).  At that point, NGI was in the position of Giacomini and Yamaguchi – the junior party challenging the date of an earlier, valid patent – and the burden shifted to NGI to come forward with evidence and argument disputing the sufficiency of the written disclosure of the Raymond provisional.

17

Based on its misreading of *Giacomini* and *Yamaguchi*, the Board erred as a matter of law in disregarding the legal effective date of the Raymond patent, instead requiring Dynamic to prove adequate written description, rather than the challenging NGI.  This error, coupled with NGI's failure to offer any evidence or argument that the Raymond provisional application lacks written description support for the Raymond patent under 35 U.S.C. § 112, requires this Court to reverse the Board, and invalidate claims 1 and 12 of the '196 patent.

### 4.    The Fundamental Principle of "First to Invent" Favors Reversal.

As discussed extensively in *Giacomini*, this conclusion is necessary in view of the "[t]he fundamental rule ... that the patentee must be the first inventor." *Alexander Milburn Co. v. Davis–Bournonville Co.*, 270 U.S. 390, 402 (1926). In *Milburn*, the Supreme Court held that a patent applied for before but not granted until after a second patent is sought bars the issuance of the second patent.  *Id.* at 400–01.  The rule stems from the principle that, subject to certain exceptions, "one really must be the first inventor in order to be entitled to a patent."  *Id.* at 400. Although Milburn concerned a non-provisional application, a provisional application similarly shows that someone else was the first to invent. *See Id.* at 400. ("[O]bviously one is not the first inventor if ... somebody else has made a complete and adequate description of the thing claimed before the earliest moment to which the alleged inventor can carry his invention back.").  In *Giacomini*, the

Court stated that the Tran provisional evinces that Tran, and not Giacomini, was the first to invent the claimed subject matter. *Giacomini*, 612 F.3d at 1385. Thus, allowing Giacomini's application would have created an anomalous result where someone who was not the first to invent in the United States receives a patent.

In this case, the Board has allowed the exact anomalous result warned of in *Giacomini*. Based on the record and the law, Raymond was the first to invent "molded lenticular articles." Fundamentally, NGI's '196 patent should not be allowed. Since the Board's findings do not credit the Raymond patent as such, its Decision unjustly places NGI first. This Court should reverse the Board's Decision as both legally and factually wrong. *Price*, 988 F.2d at 1190.

## C. <u>In the Alternative, Dynamic Provided Sufficient Evidence And Argument That the Raymond Provisional Provided Written Description Support For the Raymond Patent</u>.

Even if the Board does not conclude that the Board erred in placing the burden of persuasion on Dynamic, Dynamic did come forward with sufficient evidence that the Raymond provisional provided written description support under 35 U.S.C. § 112 for the Raymond patent.

### 1. Dynamic's Claim Chart Establishes Anticipation of Claim 1 of the '196 Patent by the Raymond Provisional.

Although no such claim chart was required in *Giacomini*, and the Board actually generated the claim chart in *Yamaguchi*, 2008 WL 4233306, *10, for reasons unexplained by our Board, the chart below was found deficient in that it

only compares one claim of the '196 patent to the disclosure in the Raymond

provisional.

| U.S. Patent No. 6,635,196 Claim 1 (A123-A135) | Raymond Provisional (A139-A156) |
|---|---|
| A method for making a molded article having a lenticular image attached thereto, the method comprising the steps of: | Raymond provisional – page 1, lines 5-7. This invention pertains to plastic cups and consumer and commercial containers, lids, and plastic containers, widths, and other molded objects of all types, shapes, and sizes including lenticular lens sheet on one or more of its surfaces.<br><br>Raymond provisional – page 2, lines 6-8. the invention provides an efficient and economical method to produce a plastic injection molded cup, or injection molded container or injection molded part by molding pre-extruded and printed len(s) sheets inside the injection mold. |
| providing a mold having a mold cavity in which to form the molded article having a lenticular image, the lenticular image comprising a lenticular lens and interlaced image, the mold cavity having a size that is appropriate to the molded article with the lenticular image; | Raymond provisional – Page 6, lines 17-19. In almost all cases, the molding tool must be made to accommodate the Lenticular Part.<br><br>Raymond provisional – Page 4, lines 6-8.The pre-extruded lens material is then printed on the reverse side or second surface via web or offset press. The lens is printed with the corresponding interlaced images in conjunction with the appropriate mathematics of the lens material. |
| inserting the lenticular image into the mold cavity; | Raymond provisional – Page 6, Lines 17-18. The piece (lenticular piece) is then placed via hand or robotics into the mold for injection molding. |
| introducing a molten plastic into the mold cavity having the lenticular image therein to form the molded article with the | Raymond provisional Page 6, line 19 – page 7, line 3. The lenticular part is placed in the mold so that the hot melt poly side of the part is exposed to the molten plastic in the mold. The |

| lenticular image attached thereto, the molten plastic introduced at at least one of a temperature, a pressure, and a turbulence that minimizes any distortion to the lenticular lens and any degradation to the interlaced image; and | plastic liquid resin is injected under high heat and pressure. The hot melt, when exposed to the liquid plastic (at around 500° F but variable depending on the polymer used) is activated in a split second and becomes a liquid for an instant and then resolidifies in the mold as the entire process cools. This process creates an instant and permanent bond between the lenticular part and the cup or other molded object or art. |
|---|---|
| removing the molded article having the attached lenticular image from the mold cavity. | Raymond provisional shows a molded lenticular cup that has been removed from a mold cavity in Fig. 1. |

(Pet.'s Reply, pp.4-6).

The Raymond provisional is sufficient to support the claims of the Raymond patent under 35 U.S.C. § 112 and thus to reject the claims of the '196 patent under 35 U.S.C.§ 102(e).  (*See* A139-A156).

> ### 2.    The Record Allows For a Full Correspondence Between the Raymond Patent, the Raymond Provisional and the '196 Patent.

Although the Board found fault with Dynamic's failure to include reference to the Raymond patent in the reply brief claim chart, such a claim chart was already in the record as part of Dynamic's petition for IPR. Combining the charts from Dynamic's two briefs (reference to the Raymond publication has been omitted), and cutting and pasting them together below, one can complete the type of chart referenced in *Yamaguchi*.

| U.S. Patent No. 6,635,196 Claim 1 (A123-A135) | Raymond Provisional (A139-156) | Raymond Patent (A157-A174) |
|---|---|---|
| A method for making a molded article having a lenticular image attached thereto, the method comprising the steps of: | Raymond provisional – page 1, lines 5-7. This invention pertains to plastic cups and consumer and commercial containers, lids, and plastic containers, widths, and other molded objects of all types, shapes, and sizes including lenticular lens sheet on one or more of its surfaces.<br><br>Raymond provisional – page 2, lines 6-8. the invention provides an efficient and economical method to produce a plastic injection molded cup, or injection molded container or injection molded part by molding pre-extruded and printed len(s) sheets inside the injection mold. | Raymond patent – Col. 6, Line 67 to Col. 7, Line 2 – according to one important aspect of the container (10), a lenticular insert (20) is included and attached to an outer wall (12) of the container (10)<br>Raymond patent – Col. 1, Lines 14-18 – a method of fabricating plastic objects having a lenticular lens sheet, or insert, that is bonded to the object<br>Raymond patent – Fig. 4 – the fabrication method is drawn to a molding process (52) |
| providing a mold having a mold cavity in which to form the molded article having a lenticular image, the lenticular image comprising a lenticular lens and interlaced image, the mold cavity having a size that is appropriate to the molded article with the lenticular image; | Raymond provisional – Page 6, lines 17-19. In almost all cases, the molding tool must be made to accommodate the Lenticular Part.<br><br>Raymond provisional – Page 4, lines 6-8.The pre-extruded lens material is then printed on the reverse side or second surface via web or offset press. The lens is printed with the corresponding interlaced images in conjunction with the | Raymond patent – Col. 13, Line 66 to Col. 14, Line 8 – a mold (80) has a mold cavity (90) to form a molded article (10) having a lenticular image<br>Raymond patent – Col. 2, Lines 9-48 – interlaced segments of images are combined with lenticular lens to form a lenticular insert (20) |

| | appropriate mathematics of the lens material. | |
|---|---|---|
| inserting the lenticular image into the mold cavity; | Raymond provisional – Page 6, Lines 17-18. The piece (lenticular piece) is then placed via hand or robotics into the mold for injection molding. | Raymond patent – Fig. 4 – references the insert step (20) Raymond patent – Col. 13, Lines 66 and 67 – the lenticular insert (20) is placed into the mold cavity (90); see also Fig. 5 |
| introducing a molten plastic into the mold cavity having the lenticular image therein to form the molded article with the lenticular image attached thereto, the molten plastic introduced at at least one of a temperature, a pressure, and a turbulence that minimizes any distortion to the lenticular lens and any degradation to the interlaced image; and | Raymond provisional Page 6, line 19 – page 7, line 3. The lenticular part is placed in the mold so that the hot melt poly side of the part is exposed to the molten plastic in the mold. The plastic liquid resin is injected under high heat and pressure. The hot melt, when exposed to the liquid plastic (at around 500° F but variable depending on the polymer used) is activated in a split second and becomes a liquid for an instant and then resolidifies in the mold as the entire process cools. This process creates an instant and permanent bond between the lenticular part and the cup or other molded object or art. | Raymond patent – Col. 1, Lines 15-18 – a fabrication method includes a process of bonding lenticular lens material to the constituent plastic of the object during the molding process without damaging the lenticular lens material Raymond patent – Col. 14, Lines 32-35 – a material charge or plastic liquid resin (72) is injected into the mold cavity (90) under high heat and pressure Raymond patent – Col. 15, Lines 26-29 – the molten plastic (72) is blocked from flowing onto the optical ridges (22) of the lenticular insert (20) and is limited to flow paths that form the shape and outer wall (12) of the article (10) |
| removing the molded article having the attached lenticular image from the mold cavity. | Raymond provisional shows a molded lenticular cup that has been removed from a mold cavity in Fig. 1. | Raymond patent – Col. 15, Lines 7-8 – the article (10) with its integrally bonded lenticular insert (20) is ejected by an ejector (86) |

23

While Dynamic maintains that NGI was required to establish a lack of written description support in the Raymond provisional[2], there was ample support in the record for the Board to conclude that the Raymond provisional did provide sufficient written description disclosure under 35 U.S.C. § 112.  As shown, the petition compared the '196 patent to Raymond, and established that the Raymond patent anticipated.  And, Dynamic's reply compared the '196 patent to the Raymond provisional, and establishes that the Raymond provisional anticipated.  Yet, the Board found Dynamic's failure to offer a claim chart for the Raymond patent versus the Raymond provisional as a dispositive failure of proof.

The evidence is plainly there.  In mathematical terms, where A (Raymond) equals B ('196) [per Dynamic's petition], and B ('196) equals C (Raymond provisional) [per Dynamic's reply], then A (Raymond) must equal C (Raymond provisional): the Raymond patent and Raymond provisional track by necessary implication.  The only rationale for deeming Dynamic's proof insufficient is to elevate the form (not accepting or considering the multiple charts, preferring instead a single, three reference chart) over the substance (the available comparative evidence between the three references in the record).  *Compare Yamaguchi*, 2008 WL 4233306, *10.  (discussing where the Board prepared a claim chart to compare references).

---

[2] Brief, §V.B, *supra.*

The Board's failure to recognize or accept the two claim charts as satisfying the obligation – which the Board had wrongly imposed on Dynamic – to show adequate written description, particularly since the charts were unrebutted by NGI, was unsupportable and clearly erroneous. 5 U.S.C. § 706(2); *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1565 (Fed. Cir. 1987).

### 3. A Separate Chart for Claim 12 Was Unnecessary Because of NGI's Response.

The Board also took issue with the fact that Dynamic only included one of the two claims of the '196 patent at issue in its reply. (A106-A107). But, earlier in the Decision, the Board noted that NGI did not distinguish claims 1 and 12 from Raymond. Likewise, NGI did not distinguish the date of reduction to practice of claims 1 and 12. Moreover, the earliest date NGI argued that its "invention" was reduced to practice was on or before March 28, 2000. (NGI Patent Owner Response, p. 7). Presumably, "the invention" included the subject matter of all of the claims of the '196 patent. In any case, that date was well after the February 15, 2000 filing date of the Raymond provisional. In that neither the Board nor NGI ever distinguished claim 1 from claim 12 for reasons of patentability or priority over Raymond, this Court should not either.

NGI likely did not argue that claims 1 and 12 are distinguishable for patentability or priority purposes because these claims are highly similar. The only differences are that the lenticular image is "integral" therewith as opposed to

25

"attached thereto" the molded article and that claim 12 includes the step of "cooling the molten plastic such that the plastic and the lenticular image form the molded article having the lenticular image integral therewith." (A133 at 10:33-53; A134 at 11:41-12:8.)

The Raymond provisional clearly discloses the step of cooling the molten plastic such that the plastic and the lenticular image form the molded article. (A147-A148). This disclosure tracks into the Raymond patent. (A171 at 15:4-5). Likewise, the Raymond provisional discloses the step of making the lenticular image integral with the molded article. (A144). The disclosure was carried over into the Raymond patent. (A165 at 3:22-26).

Because NGI did not distinguish claim 1 from claim 12 in its effort to antedate, the Board's criticism of Dynamic's lack of a chart for claim 12 is puzzling. Raymond's patent anticipates claim 12, and like claim 1, the provisional application date has both priority over the '196 patent and a clear written description available in the record. Thus, either NGI failed to challenge the written description of claim 12 in the Raymond provisional, or Dynamic adequately supported it with the exhibits filed, for which there was no rebuttal. In either event, the Board's finding was clear error and unsupportable. 5 U.S.C. § 706(2); *Ethicon*, 135 F.3d at 1460.

## VI.    CONCLUSION

Appellant, Dynamic Drinkware, respectfully submits that it demonstrated that: (1) the Board erred in failing to find that the Raymond patent qualifies as prior art under 35 U.S.C. § 102(e); the Board erred in placing the burden of proof and persuasion on Appellants in proving that the Raymond provisional provides adequate written description support under 35 U.S.C. § 112 for the Raymond patent; and (3) that the Raymond provisional provides adequate written description support under 35 U.S.C. § 112 for the Raymond patent.  Therefore, Dynamic respectfully requests that this Court reverse the Decision of the Board, and invalidate claims 1 and 12 of the '196 patent.

Dated: February 27, 2015          Respectfully submitted,

/s/Matthew R. McClean_____
Attorneys for the Appellant
Matthew R. McClean
Davis & Kuelthau, s.c.
111 E. Kilbourn Ave., Ste. 1400
Milwaukee, WI 53202-6613
414.225.1420 (direct line)
414-278-3620 (direct fax)
mmcclean@dkattorneys.com

Joseph S. Heino
Reg. No. 31,524
Davis & Kuelthau, s.c.
111 E. Kilbourn Ave., Ste. 1400
Milwaukee, WI 53202-6613
414.225.1452 (direct line)
414.278.3652 (direct fax)
jheino@dkattorneys.com

27

Patrick M. Bergin
Reg. No. 54,994
Davis & Kuelthau, s.c.
111 E. Kilbourn Ave., Ste. 1400
Milwaukee, WI 53202-6613
414.225.7563 (direct line)
414-278-3763 (direct fax)
pbergin@dkattorneys.com

## PROOF OF SERVICE

I hereby certify that on this 27th day of February, 2015, the foregoing

**Appellant's Brief** was filed with the United States Court of Appeals for the

Federal Circuit via its CM/ECF Electronic Filing System and required number of

copies thereof were filed and served as set forth below:

*FILING BY OVERNIGHT UPS*

Clerk of Court
United States Court of Appeals
 for the Federal Court
717 Madison Place, NW
Washington, DC 20439

Counsel for National Graphics, Inc.
Michael T. Griggs, Esq.
Keith M. Baxter, Esq.
Sarah M. Wong, Esq.
Boyle Fredrickson, S.C.
840 N. Plankinton Ave.
Milwaukee, WI 53217

Dated: February 27, 2015          Respectfully submitted,

/s/Matthew R. McClean_____
Attorneys for the Appellant
Matthew R. McClean
Davis & Kuelthau, s.c.
111 E. Kilbourn Ave., Ste. 1400
Milwaukee, WI 53202-6613
414.225.1420 (direct line)
414-278-3620 (direct fax)
mmcclean@dkattorneys.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 6568 words, excluding the parts, of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14 size font.

Dated: February 27, 2015          Respectfully submitted,

/s/Matthew R. McClean_____
Attorneys for the Appellant
Matthew R. McClean
Davis & Kuelthau, s.c.
111 E. Kilbourn Ave., Ste. 1400
Milwaukee, WI 53202-6613
414.225.1420 (direct line)
414-278-3620 (direct fax)
mmcclean@dkattorneys.com

30

15-1214

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

DYNAMIC DRINKWARE, LLC
Appellant,

v.

NATIONAL GRAPHICS, INC.
Appellee

Appeal from United States Patent and Trademark Office
Proceeding No. IPR 2013-00131
Patent 6,635,196

ADDENDUM

DAVIS & KUELTHAU, s.c.

Joseph S. Heino, WI SBN 1003931
Matthew R. McClean, WI SBN 1041470
Patrick Bergin, SBN 1037754
111 East Kilbourn Avenue, Suite 1400
Milwaukee, WI 53202
(414) 276-0200

Trials@uspto.gov
Tel: 571-272-7822

Paper 42
Entered: September 12, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

DYNAMIC DRINKWARE LLC,
Petitioner,

v.

NATIONAL GRAPHICS, INC.,
Patent Owner.

———————————

Case IPR2013-00131
Patent 6,635,196

———————————

Before THOMAS L. GIANNETTI, TRENTON A. WARD, and
MITCHELL G. WEATHERLY, *Administrative Patent Judges.*

GIANNETTI, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00131
Patent 6,635,196

# I. INTRODUCTION

Dynamic Drinkware ("Petitioner") filed a corrected Petition requesting *inter partes* review of claims 1, 8, 12, and 15 of U.S. Patent No. 6,635,196 to Goggins (Ex. 1001, "the '196 patent"). Paper 10 ("Pet."). National Graphics, Inc. ("Patent Owner") filed a Preliminary Response. Paper 15. Based on these submissions, we instituted trial, but only as to claims 1 and 12 of the '196 patent. Paper 16 ("Institution Decision").

After institution, Patent Owner filed a Response (Paper 22; "PO Resp.") and Petitioner filed a corrected Reply (Paper 34; "Pet. Reply"). In addition Patent Owner filed a Motion to Amend (Paper 23) and Petitioner filed a corrected Opposition to that motion (Paper 33). Oral Hearing was held on July 24, 2014, and the Hearing Transcript ("Tr.") has been entered in the record. Paper 41.

We have jurisdiction under 35 U.S.C. § 6(c). This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a). We conclude that Petitioner has failed to prove by a preponderance of the evidence that claims 1 and 12 of the '196 patent are unpatentable.

## A. Related Proceeding

Petitioner has identified, as a related proceeding, a district court case in which Petitioner is a defendant involving the '196 patent and other patents, captioned *National Graphics, Inc. v. Brax Ltd.,* Case Number 12-C-1119 (E.D. Wis.). Pet. 2.

2

IPR2013-00131
Patent 6,635,196

## B. The '196 Patent

The '196 patent issued October 21, 2003, from an application filed November 22, 2000.  The patent identifies, and claims benefit of, a provisional application filed on June 12, 2000.  Ex. 1001, col 1, ll. 4-5.

The '196 patent is directed to methods for making molded plastic articles bearing a "lenticular" image.  *Id.* at col. 1, ll. 8-14.  As described in the patent, a lenticular image is a segmented image comprising one or more component images.  *Id.* at col. 1, ll. 49-51.  The segments are interlaced in any conventional manner and mapped (i.e., aligned) to a lenticular lens.  *Id.* at col. 1, ll. 51-53.  The interlaced images can be viewed through the lens to create visual effects such as motion or depth.  *Id.* at col. 3, ll. 43-56.

As discussed in the patent specification the aesthetic requirements for molded plastic parts depend on their end use and the specification gives a number of examples where aesthetics would be important:

> For those products that are used in applications in which their use is *visible to an end user*, or in which their appearance is important to their sale, e.g., promotional items, automobile and appliance facie, cups, bottles, bottle caps/enclosures, snowboards or wake boards, skis (e.g., water, snow), cameras, computer cases (e.g., laptop cases), cell phone (or other electronic) cases, cosmetic cases, collectibles, signs, magnets, coasters, display posters, menu boards, postcards, business cards, and packaging on boxes, the aesthetics of the product are important.

Ex. 1001, col. 1, ll. 35-45 (emphasis added).

As described in the Background section of the '196 patent, lenticular images are one way of improving the look of a product:

> One way to improve the look of a product is to incorporate into it bright color schemes and fancy or even glitzy decor so as to

3

IPR2013-00131
Patent 6,635,196

> attract and keep a viewer's attention. The application of a
> lenticular image is one form of such a decor.

*Id.* at col 1, ll. 46-49.

## C. Illustrative Claim

Both claims 1 and 12 are independent process claims. Claim 1,
reproduced below, is illustrative:

> 1. A method for making a molded article having a
> lenticular image attached thereto, the method comprising the
> steps of:
>> providing a mold having a mold cavity in which to form the
> molded article having a lenticular image, the lenticular image
> comprising a lenticular lens and interlaced image, the mold
> cavity having a size that is appropriate to the molded article
> with the lenticular image;
>> inserting the lenticular image into the mold cavity;
> introducing a molten plastic into the mold cavity having the
> lenticular image therein to form the molded article with the
> lenticular image attached thereto, the molten plastic introduced
> at at least one of a temperature, a pressure, and a turbulence that
> *minimizes any distortion to the lenticular lens and any*
> *degradation to the interlaced image*; and
>> removing the molded article having the attached
> lenticular image from the mold cavity.

(Emphasis added).

## II. ANALYSIS

### A. Claim Construction

The claim constructions provided in our Institution Decision were not
challenged by the parties, including our construction of the "minimizing"
limitation, italicized in claim 1 above, which limitation appears also in claim
12. For the purposes of this Final Decision, therefore, we adopt for that
limitation the following construction from our Institution Decision:

4

IPR2013-00131
Patent 6,635,196

> We interpret "minimizes any distortion to the lenticular lens
> and any degradation to the interlaced image" to require that the
> claimed methods sufficiently prevent distortion to the lenticular
> lens or degradation of the interlaced image so that the *intended
> visual effect* of the lenticular image *still functions properly*
> within the finished molded article.

Institution Decision 8 (emphasis added). The other claim constructions from
our Institution Decision are not material to this decision and therefore will
not be discussed further.

## B. Antedating Raymond

The Petition challenged claims 1, 8, 12, and 14 of the '196 patent on
several grounds. Trial was instituted, however, for two claims only (claims
1 and 12), based upon one ground: anticipation by U.S. Patent No. 7,153,555
(Ex. 1003; "Raymond").

Patent Owner's Response does not attempt to distinguish claims 1 and
12 from the teachings of Raymond. Instead, Patent Owner contends that
Raymond does not qualify as prior art because the subject matter of claims 1
and 12 was reduced to practice before Raymond's effective date as prior art
under 35 U.S.C. § 102(e). PO Resp. 7.

### i. Effective Date of Raymond

The parties dispute the effective date of Raymond as prior art. The
application for Raymond was filed on May 5, 2000, claiming benefit of a
provisional application filed on February 15, 2000. Ex. 1003, col. 1, ll. 6-8.
Patent Owner argues that Petitioner has failed to meet the burden of
establishing Raymond is entitled to benefit of the earlier provisional filing
date; therefore, Raymond's effective date under 35 U.S.C. § 102(e) is its
May 5, 2000, filing date. PO Resp. 3-7. In response, Petitioner attempts to

IPR2013-00131
Patent 6,635,196

rebut this by presenting a chart comparing claim 1 of the '196 patent to the Raymond provisional. Reply 4-5. No similar chart is provided for claim 12.

We agree with Patent Owner that Petitioner has failed to prove by a preponderance of the evidence that Raymond is entitled to the benefit of the earlier provisional filing date. To be entitled to rely on the February 15, 2000 provisional filing date, Petitioner had to establish that it relies on subject matter from Raymond that is present in and supported by its provisional. *In re Giacomini*, 612 F.3d 1380, 1383 (Fed. Cir. 2010) ("Therefore, an applicant is not entitled to a patent [under § 102(e) (2)] if another's patent discloses the same invention, which was carried forward from an earlier U.S. provisional application . . . ."); *Ex Parte Yamaguchi*, 88 USPQ2d 1606 (BPAI 2008) (precedential).

In *Yamaguchi*, the appellants challenged the Examiner's rejections based on a patent to Narayanan under 35 U.S.C. § 102(e). 88 USPQ2d at 1608. The Board noted that the filing date of Narayanan's underlying provisional application would antedate the earliest effective filing date of the rejected application. *Id*. at 1613. But appellants took the position that the Examiner had failed to show that the provisional application properly supports the subject matter of the patent relied on in making the rejection. *Id*. The Board disagreed, and provided a chart correlating the Examiner's fact findings on anticipation with both the Narayanan patent and Narayanan provisional application. *Id*. at 1614. The chart demonstrated that the Examiner's findings were supported by subject matter common to the patent and the provisional application. *Id*.

Petitioner has not provided the analysis of common subject matter required by *Yamaguchi* and *Giacomini*. Instead, Petitioner's chart compares

6

IPR2013-00131
Patent 6,635,196

only one '196 patent claim to the Raymond provisional. It does not compare the portions of Raymond's patent relied on by Petitioner to the Raymond provisional, to demonstrate that those portions were carried over from the provisional. We therefore conclude that Petitioner has failed to carry its burden of proof that Raymond's effective date is earlier than May 5, 2000.

## ii. Reduction to Practice

As a result of our determination that Raymond's effective prior art date is May 5, 2000, if Patent Owner can prove a reduction to practice of claims 1 and 12 prior to that date, Patent Owner can antedate Raymond and eliminate it as a reference. *See, e.g., Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1577 (Fed. Cir. 1996); *In re Facius,* 408 F.2d 1396, 1404 (CCPA 1969).

Petitioner contends that Patent Owner has failed to meet its burden to antedate Raymond. Pet. Reply. 6. We disagree. Having reviewed this record, we conclude that Patent Owner has carried successfully its burden of establishing by a preponderance of the evidence an actual reduction to practice of claims 1 and 12 prior to Raymond's effective date.

## iii. Summary of Testimony

To establish prior actual reduction to practice, Patent Owner relies on declaration testimony from two fact witnesses: Don Krause (Ex. 2003; "Krause Decl.") and Matt Walker (Ex. 2004; "Walker Decl."). In opposition, Petitioner relies on declaration testimony from named inventor Timothy Goggins (Ex. 1028; "Goggins Decl.") and expert David Roberts (Ex. 1029; "Roberts Decl."). The testimony of these witnesses is summarized below.

IPR2013-00131
Patent 6,635,196

<u>Don Krause</u>

Krause, the founder and president of Patent Owner ("NGI"), testifies that in November 1999, NGI was interested in implementing technology for making injection molded lenticular articles. Krause Decl. ¶¶ 1-2. An NGI sales representative, Walker, contacted Rexam, an injection molding company, about producing an injection-molded lenticular cosmetic case. *Id.* ¶¶ 3-4. Krause refers to logs of Walker's phone calls with Rexam. *Id.* ¶ 5.

Krause also identifies the sample cosmetic case (Ex. 2002) produced at Rexam "during the first successful injection molding run." *Id.* ¶ 6. The cosmetic case is pictured below.

 

Exhibit 2002 (Cosmetic Case)

Relying on Walker's phone logs, Krause testifies that the "first test run occurred sometime between March 15, 2000 and March 28, 2000." *Id.* ¶ 6.

Krause also testifies about various meetings that took place at NGI and identifies notes he took at those meetings. *Id.* ¶¶ 8-10. He identifies a page from the notebook of Tim Goggins, the named inventor of the '196 patent, who worked for NGI at the time. *Id.* ¶ 11. *See* Ex. 2008. The page, dated June 5, 2000, identifies Rexam and states "Initial test on a custom part were succesfull [sic] . . . ." *Id.*

IPR2013-00131
Patent 6,635,196

<u>Matt Walker</u>

Walker, a former NGI employee, had been a sales representative with prior experience in the cosmetics industry. Walker Decl. ¶¶ 1-2. He testifies that he suggested using a cosmetic case to implement injection molded lenticular lens technology at NGI. *Id.* ¶ 3. Accordingly, he "reached out" to various injection molders, and Rexam, an injection molding company in Wisconsin, expressed interest. *Id.* ¶¶ 4-5.

Walker identifies his phone log (Ex. 2005) and testifies to the dates of various communications he had with Rexam concerning the project. *Id.* ¶¶ 6-9. He also identifies the sample cosmetic case (Ex. 2002, pictured above), which he testifies was molded by Rexam between March 15 and March 28, 2000. Walker Decl. ¶ 10. He testifies that the lenticular portion is the cover of the case. *Id.*

Referring to the sample, Walker testifies that this was the first successful test run of NGI's injection molding process for forming a lenticular article. *Id.* ¶ 11. He testifies that the test run was successful. *Id.* Based upon his inspection of the mold prior to the test run, he testifies as to his understanding of the process used to make the cosmetic case. *Id.*

<u>Timothy Goggins</u>

Goggins worked for NGI from 1984 to March 17, 2004. Goggins Decl. ¶ 2. Currently he is employed by Pixalen Studios, LLC, as Studio Director. *Id.* ¶¶ 1-2. He testifies that Pixalen is "a company that is related to" Petitioner. *Id.* ¶ 4. At Pixalen, Goggins designs lenticular artwork for molded lenticular products and has been active in the lenticular industry since at least 1994. *Id.* ¶ 4-5.

IPR2013-00131
Patent 6,635,196

While employed at NGI, Goggins was assigned by Krause to develop an in-mold lenticular product. *Id.* ¶ 7. At the time, he had worked on other lenticular projects, but had no experience with plastic molding. *Id.* ¶¶ 7-8. He testifies he has reviewed the Krause and Walker testimony, and was present at Rexam when most of the cosmetic case mold testing was done. *Id.* ¶¶ 9-11.

Referring to Rexam, Goggins testifies while the testing did result in molded lenticular products, "the products that were molded exhibited degradation to the lenticular image and distortion to the lenticular lens." *Id.* ¶ 11. He testifies that "[n]one of the testing we performed at Rexam resulted in an acceptable lenticular product." *Id.* ¶ 12. "None of the products produced at Rexam represented a molded lenticular item in which distortion to the interlaced image had been minimized or in which degradation of the lenticular lens had been minimized in a way that was consistent with the claims of the '196 patent." *Id.* ¶ 13.

Goggins testifies that his June 5, 2000, notebook entry "confirms that we still had a long way to go to prepare a molded lenticular item in which distortion to the interlaced image has been minimized or in which degradation of the lenticular lens has been minimized." *Id.* ¶ 14. In support, he discusses a number of specific entries from the notebook. *Id.*

Goggins further testifies that when the Rexam tests failed to make a good lenticular part, NGI started experimenting with coatings to protect the ink on the printed surface. *Id.* ¶¶ 15-16. NGI partnered with Grimm Industries, another injection molding company. He visited Grimm and was present when they tested injection molded lenticular parts. *Id.* ¶¶ 17-18. He states the work with Grimm resulted in a successful molded lenticular cup

10

IPR2013-00131
Patent 6,635,196

that became Figure 10 of the '196 patent.  *Id.* ¶¶ 19-20.  That cup is pictured below:



(Photograph of Cup)

*Id.* ¶ 21.  Goggins does not believe the Grimm cup was molded when his provisional application was filed on June 12, 2005.  The cup quality was not "perfect," showing slight misalignment of the image and some damage to the protective layer.  *Id.* ¶ 23.  A sample of the Grimm cup was provided to Rexam.  *Id.* ¶ 24.  He kept a later sample of the Grimm cup.


David Roberts

Roberts is an expert in molded lenticular products.  Roberts Decl. ¶ 1. He inspected the sample cosmetic case (Ex. 2002) both visually and using a portable 300X microscope.  *Id.* ¶ 11.  From a visual inspection he describes the lenticular image as "fuzzy and indistinct."  *Id.* ¶ 12.  He describes other aspects of the image as having "problems."  *Id.* ¶¶ 11-14.  His further analysis is based on microscopic images of the sample.  *Id.* ¶¶ 15-26.

He concludes:  "In my professional opinion, the cosmetic case does not represent a molded lenticular item in which distortion to the interlaced image has been minimized or in which degradation of the lenticular lens has

11

IPR2013-00131
Patent 6,635,196

been minimized." *Id.* ¶ 27. He further concludes: "Nor is this a situation in which distortion of the lenticular image and degradation of the lenticular lens has been functionally eliminated." *Id.* He further testifies:

> In my professional opinion, the intended visual effect of the lenticular image in the cosmetic case is substantially destroyed by the distortion of the interlaced image, the loss of the lenticular image in the gate area where molten resin has pushed the image into an unrecognizable blob, and the degradation of the lenticular lens.

*Id.* ¶ 28. He concludes that the sample "does not constitute a successful reduction to practice of the invention claimed in the '196 patent." *Id.* ¶ 29.

### iv. Principles of Law

To establish an actual reduction to practice, the inventor must prove (1) that he constructed an embodiment or performed a process that meets all the claimed limitations of the invention, and (2) determined that the invention worked for its intended purpose. *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998). "The essential inquiry here is whether the *advance in the art* represented by the invention . . . was embodied in a workable device that demonstrated that it could do what it was claimed to be capable of doing." *Scott v. Finney*, 34 F.3d 1058, 1063 (Fed. Cir. 1994) (quoting *Farrand Optical Co. v. United States,* 325 F.2d 328, 333 (2d Cir. 1963)). "In tests showing the invention's solution of a problem, the courts have not required commercial perfection nor absolute replication of the circumstances of the invention's ultimate use." *Id.* "Less complicated inventions and problems do not require stringent testing." *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1578 (Fed. Cir. 1996) (citing *Scott,* 34 F.3d at 1062).

12

IPR2013-00131
Patent 6,635,196

The testing that is required depends upon the intended use of the invention. As the Federal Circuit explains,

> We reiterate that testing is relevant in that it is evidence of whether the inventor would have known that an invention is suitable for its intended purpose. As one of this court's predecessors, the Court of Claims, explained, "the inquiry is not what kind of test was conducted, but whether the test conducted showed that the invention would work as intended in its contemplated use."

*Slip Track Sys., Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256 (Fed. Cir. 2002) (quoting *E. Rotorcraft Corp. v. United States*, 384 F.2d 429, 431 (Ct. Cl. 1967)). As an example, in *Sellner v. Solloway*, 267 F.2d 321 (CCPA 2002), actual reduction to practice of the invention — an exercise chair — was established by witnesses who tried the chair out at a birthday party. *Id.* at 323.

There is no requirement that the invention, when tested, be in a commercially satisfactory stage of development. *Steinberg v. Seitz*, 517 F.2d 1359, 1363 (Fed. Cir. 1975) (citing *In re Dardick*, 496 F.2d 1234, 1238 (CCPA 1974)); *DSL Dynamic Sciences Ltd. v. Union Switch & Signal*, 928 F.2d 1122, 1126 (Fed. Cir. 1991). The fact that further refinements of the invention were made is not relevant. *Farrand Optical*, 325 F.2d at 332; *Loral Fairchild Corp. v. Matsushita Elec. Indus. Co., Inc.*, 266 F.3d 1358, 1362-63 (Fed. Cir. 2001) ("Once the invention has been shown to work for its intended purpose, reduction to practice is complete. Further efforts to commercialize the invention are simply not relevant to determining whether a reference qualifies as prior art against the patented invention.") (internal citation omitted).

IPR2013-00131
Patent 6,635,196

v. Analysis

Patent Owner contends that the methods of claims 1 and 12 were reduced to practice by March 28, 2000, when the sample cosmetic case (Ex. 2002) was produced at Rexam using the claimed process. PO Resp. 7-11. Alternatively, should the effective filing date of Raymond be determined to be February 15, 2000, Patent Owner contends that there is a sufficient showing of diligence to antedate the Raymond reference. *Id.* at 17. Because we have determined that Raymond effectively was filed on May 5, 2000 (*see supra*), we do not address this alternative argument or Petitioner's response. Pet. Reply 8-9.

Petitioner first argues that Raymond, not Goggins, is the "first inventor," Raymond having conceived of his invention "well prior to December 2, 1999" and diligently reduced it to practice. Pet. Reply 1. We are not persuaded by this argument. The Raymond patent is a reference under 35 U.S.C. § 102(e); its effective date here cannot be moved back by Raymond's pre-filing activities. *See Sun Studs, Inc. v. ATA Equip. Leasing, Inc.*, 872 F.2d 978, 983 (Fed. Cir. 1989)("When patents are not in interference, the effective date of a reference United States Patent as prior art is its filing date in the United States, as stated in § 102(e), not the date of conception or actual reduction to practice of the invention claimed or the subject matter disclosed in the reference patent.").

Petitioner further contends that Patent Owner's proffered "non-inventor" testimony (i.e., Krause, Walker) is unreliable. Pet. Repl. 6-7.[1] Petitioner points instead to Goggins's testimony, e.g., that a reduction to

---

[1] It is well-established that inventor testimony is not necessary to prove reduction to practice. *Borror v. Herz*, 666 F.2d 569, 575 (CCPA 1981).

14

IPR2013-00131
Patent 6,635,196

practice did not take place until after May 2000, when Goggins began working with Grimm. *Id.* at 7. Petitioner also contends that the other evidence of reduction to practice presented by Patent Owner is inadequate. Pet. Reply 9. Petitioner focuses this argument mainly on the sample cosmetic case of Exhibit 2002, asserting that it was not produced by a process that meets all the claim limitations, and that it does not work for its intended purpose. Pet. Reply 9-10.

Petitioner identifies various deficiencies in the sample, including "the lenticular image is fuzzy and indistinct;" and "[p]roblems with the interlaced image are visible with the naked eye." *Id.* at 10. Referring to the Roberts testimony, Petitioner also asserts "[u]nder microscopic evaluation, it is clear that there are problems with both distortion to the lenticular lens and degradation of the lenticular image." *Id.* Petitioner, however, does not challenge the descriptions provided by Krause and Walker of the work done at Rexam producing the sample or their evidence of the process by which the sample was made, facts that are corroborated largely by the Goggins testimony.

At the outset of our analysis, we note that the conflicting testimony in this case presents an unusual situation. Normally, when priority of invention is the issue, testimony of the patentee is proffered to establish the earliest invention date. Here, just the opposite is true: Goggins's testimony is proffered to establish a reduction to practice date that is *later* than the date asserted by the Patent Owner.

This is explained, in part, by the admission in Goggins's declaration that he currently is employed by a company that is "related" to the Petitioner. Goggins Decl. ¶ 4. At oral argument, Petitioner's counsel, when

15

IPR2013-00131
Patent 6,635,196

asked to elaborate, advised the Board that Goggins's current employer,
Pixalen Studios (which he created and is now its Studio Director) and
Petitioner are under common ownership. Tr. 10, ll. 1-15. Moreover, it is
clear from Goggins's testimony (and confirmed at the hearing) that Pixalen's
work falls within the field of molded lenticular products to which the '196
patent is directed. Tr. 9, ll. 13-24. As Petitioner's counsel stated, "He
[Goggins] does not have a direct financial interest in the outcome of these
proceedings, but his employer does." Tr. 12, ll. 17-19.

    As a consequence, Goggins's current interests are aligned against his
patent, and therefore, we must give close scrutiny to his conclusions
concerning perceived defects in the sample cosmetic case or whether the
tests at Rexam produced a sample that met the requirements of the '196
patent claims. The Federal Circuit has warned us that the oral testimony of
interested witnesses is unreliable. "[T]here is a very heavy burden to be met
by one challenging validity when the only evidence is the oral testimony of
interested persons and their friends, particularly as to long-past events."
*Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir.
1998).

    More telling evidence than his testimony is Goggins's June 5, 2000,
notebook page identifying Rexam and stating that the initial test on a custom
part was "succesfull [sic]." Ex. 2008.[2] At the time of the notebook entry,
Goggins was employed by Patent Owner and had no motivation to be
untruthful.

    Nor do we credit Goggins's testimony explaining the rest of the
notebook entry. He testifies that the entry "confirms that we still had a long

─────────────────────

[2] *See* Ex. 1016 for the entire notebook entry.

16

IPR2013-00131
Patent 6,635,196

way to go to prepare a molded lenticular item in which distortion to an
interlaced image has been minimized or in which degradation of the
lenticular image has been minimized." Goggins Decl. ¶ 14. He then goes
on to describe his work on the project at Grimm leading to the cup pictured
in the patent.

This testimony from Goggins does not persuade us that the claimed
process was not reduced to practice in March 2000. Evidence of further
work perfecting the invention for commercialization does not prove that no
reduction to practice occurred. *Loral Fairchild Corp.*, 266 F.3d at 1362-63.
Thus, we discount the testimony about his further experiments with Grimm.
Goggins Decl. ¶¶ 17-25.

Nor are we convinced by the Roberts testimony concerning alleged
defects in the sample cosmetic case produced at Rexam prior to March 28,
2000. The '196 patent specification makes clear the intended use of the
invention is "products that are used in applications in which their use is
visible to an end user, or in which their appearance is important to their
sale." Ex. 1001, col. 1, ll. 35-45. The patent specifically provides examples
of these products, which include cups, bottles, cell phone cases, cosmetic
cases, signs, magnets, coasters, and others where "the aesthetics of the
product are important." *Id.* at col 1, ll. 39-45.

Roberts's microscopic evaluation of the cosmetic case does not reflect
the setting in which an end user such as a consumer normally would evaluate
such products, e.g., in a store or at home. *See Slip Track Sys., Inc.*, 304 F.3d
at 1267; *Sellner*, 267 F.2d at 323. Roberts testified at his deposition that "[a]
consumer wouldn't necessarily notice a defect because they're not trained in
that area." Ex. 2010 ("Roberts Dep.") 18:24-19:1.

17

IPR2013-00131
Patent 6,635,196

Our visual inspection of the sample cosmetic case at the hearing did
not confirm that the defects pointed to by Petitioner would be "visible to the
naked eye." *See* Pet. Reply 10. For instance, on inspection at the hearing,
and confirmed by counsel, the "distortion to the image near the gate" (*id.*)
cited by Petitioner turned out to be a small ("a little wider than a millimeter,"
Tr. 71, ll. 6-7) portion along the side of the case. Roberts testified that it was
on the hinge side of the lid, which our inspection confirmed. Roberts Dep.
38:20-22. Walker testified at his deposition that the image still had
"movement," "depth," and "changes in color," which our inspection also
confirmed. Ex. 1025 ("Walker Dep.") 42:1-2.

Petitioner's arguments that there was "ongoing development" on the
process, or that "testing and experimentation continued well past March
2000" are not persuasive. Pet. Reply 11-14. As discussed previously,
commercial perfection is not a requirement for reduction to practice. *Scott*,
34 F.3d at 1063. And while we agree with Petitioner that Krause (like
Goggins) is an interested witness, the facts concerning the work done at
Rexam set forth in his declaration and in Walker's are not challenged and in
fact are corroborated by Goggins. *Compare* Ex. 2003 ¶¶ 5–6, *with* Ex. 2004
¶¶ 9–10 *and* Ex. 1028 ¶¶ 7, 11, 14, 15. We also consider the facts that
Walker is employed by neither party and has prior experience with lenticular
images and advertising in the cosmetics field, where the sample product
would be used (Walker Dep. 8:11-16; 11:16-17), when crediting his
testimony that the test at Rexam was successful.

We conclude, therefore, that Patent Owner has shown by a
preponderance of the evidence that by March 28, 2000, a sample product
was produced for Patent Owner demonstrating that the Rexam process was

IPR2013-00131
Patent 6,635,196

suitable for its intended purpose. The testimony establishes that the Rexam process was successful in injection molding a plastic product with a lenticular image that would be acceptable to the intended end user. Walker Decl. ¶ 11; Krause Decl. ¶ 7.

The question remains, however, whether all the claim elements were met. The only element challenged by Petitioner is that addressed in the Roberts declaration, namely, the "minimizing" limitation: "the molten plastic be 'introduced at at least one of a temperature, a pressure, and a turbulence that *minimizes any distortion to the lenticular lens and any degradation to the interlaced image*.'" Pet. Reply 12 (emphasis added). We note that neither the Patent Owner's Response nor the Petitioner's Reply focuses on the temperature, pressure, or turbulence recitations or other aspects of the claims; the dispute between Petitioner and Patent Owner centers on the portion of the claim (italicized above) dealing with minimizing distortion to the lens and degradation to the image which Petitioner contends is not met in the Rexam process. *Id.*; Goggins Decl. ¶ 13; Roberts Decl. ¶¶ 27-29. That is not surprising, for the '196 patent claims do not claim specific pressure, temperature, or turbulence levels. The claims say only that "the molten plastic is *introduced* at at least one of a temperature, a pressure, and a turbulence." (Emphasis added). None of the witnesses, including Goggins, disputes that this much of the claim is met by the Rexam process.

Our construction of the "minimizes" limitation requires "that the claimed methods sufficiently prevent distortion to the lenticular lens or degradation of the interlaced image so that the *intended visual effect* of the lenticular image *still functions properly* within the finished molded article."

19

IPR2013-00131
Patent 6,635,196

Institution Decision 8 (emphases added). Thus, under this construction the focus of the inquiry is on the intended visual effect, which we determine is similar to the "suitable for its intended purpose" standard for determining reduction to practice. We conclude, therefore, that our previous analysis of "suitability for intended purpose" applies also to our consideration of this claim element.

We are persuaded, for the reasons stated above, that Patent Owner has carried its burden of showing that this element was reduced to practice on or before by March 28, 2000. Our inspection of the compact case at the hearing confirms Patent Owner's evidence that its intended visual effect, while not perfect, functions properly, taking into account the nature of the product and its end users. We further conclude that the testimony from Goggins and Roberts fails to address whether the resulting sample would be acceptable to a consumer and is therefore not persuasive. On this issue, we find Walker's testimony and Goggins's notebook entry to be more persuasive evidence.

Finally, we are not persuaded by Petitioner's arguments that Patent Owner has previously "declined to attempt to antedate Raymond" or has "expressly disclaimed knowledge of the facts." Pet. Reply 14-15. For example, the argument that Patent Owner did not attempt to antedate Raymond in its Preliminary Response is unavailing in that such responses are optional. *See* 37 C.F.R. § 107(a) ("The patent owner *may* file a preliminary response to the petition.") (emphasis added). We see no reason why this and other such prior positions cited by Petitioner should be determinative here.

IPR2013-00131
Patent 6,635,196

### D. Motion to Amend

Patent Owner's Contingent Motion to Amend (Paper 23) proposes two substitute claims, numbered 17 (substitute for claim 1) and 18 (substitute for claim 12). Patent Owner states, "These substitutions are strictly contingent on the Board finding each respective original claim unpatentable, as discussed below." Motion to Amend 1. As discussed, because we determine that claims 1 and 12 are not proven unpatentable, we dismiss Patent Owner's Motion to Amend as moot.

### E. Patent Owner's Motion for Observations

We have considered Patent Owner's Motion (Paper 36), and to the extent that Patent Owner's observations are relevant they have been incorporated into our analysis.

### III. CONCLUSION

Petitioner has not demonstrated, by a preponderance of the evidence, that claims 1 and 12 of the '196 patent are anticipated by Raymond under 35 U.S.C. § 102(e).

### IV. ORDER

In consideration of the foregoing, it is hereby

ORDERED that claims 1 and 12 of the '196 patent have not been shown to be unpatentable; and

FURTHER ORDERED that Patent Owner's Contingent Motion to Amend is dismissed as moot.

This is a Final Decision. Parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00131
Patent 6,635,196


PETITIONER:

Joseph S. Heino
Patrick M. Bergin
DAVIS AND KUELTHAU, S.C.
jheino@dkattorneys.com
pbergin@dkattorneys.com


PATENT OWNER:

Michael T. Griggs
Keith M. Baxter
Sarah Wong
BOYLE FREDERICKSON, S.C.
mtg@boylefred.com
kmb@boylefred.com
smw@boylefred.com



US006635196B1

(12) **United States Patent**

Goggins

(10) Patent No.: **US 6,635,196 B1**

(45) Date of Patent: **Oct. 21, 2003**

(54) **MOLDED ARTICLES HAVING A SURFACE BEARING A LENTICULAR IMAGE**

(75) Inventor: **Timothy P. Goggins**, Nashotah, WI (US)

(73) Assignee: **National Graphics, Inc.**, Brookfield, WI (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 119 days.

(21) Appl. No.: **09/718,695**

(22) Filed: **Nov. 22, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/211,112, filed on Jun. 12, 2000.

(51) Int. Cl.$^7$ ............................................. **B29D 11/00**
(52) U.S. Cl. ................... **264/1.7**; 264/132; 264/328.12
(58) Field of Search .......................... 264/1.1, 1.7, 1.9, 264/132, 1.31, 1.32, 255, 328.1, 328.12; 359/619

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,839,129 A | * 10/1974 | Neumann | |
| 4,406,045 A | * 9/1983 | Schwab | |
| 4,576,850 A | 3/1986 | Martens | 428/156 |
| 4,582,885 A | 4/1986 | Barber | 528/28 |
| 4,668,558 A | 5/1987 | Barber | 428/156 |
| 4,906,315 A | 3/1990 | McGrew | 156/231 |
| 5,113,213 A | 5/1992 | Sandor et al. | 355/22 |
| 5,266,995 A | 11/1993 | Quadracci et al. | 355/77 |
| 5,457,515 A | 10/1995 | Quadracci et al. | 355/132 |
| 5,488,451 A | 1/1996 | Goggins | 355/77 |
| 5,494,445 A | * 2/1996 | Sekiguchi et al. | |
| 5,514,427 A | 5/1996 | Ellison et al. | 428/31 |

| | | | |
|---|---|---|---|
| 5,617,178 A | 4/1997 | Goggins | 355/22 |
| 5,642,226 A | 6/1997 | Rosenthal | 359/619 |
| 5,720,123 A | * 2/1998 | Taylor | |
| 5,847,808 A | 12/1998 | Goggins | 355/22 |
| 5,896,230 A | 4/1999 | Goggins | 359/619 |
| 5,951,939 A | 9/1999 | Chernyak et al. | 264/522 |
| 5,967,032 A | 10/1999 | Bravenec et al. | 101/211 |
| 5,968,444 A | 10/1999 | Yamamoto | 264/519 |
| 5,972,279 A | 10/1999 | Harris et al. | 264/513 |
| 5,985,198 A | 11/1999 | Harris et al. | 264/255 |
| RE36,457 E | 12/1999 | Ellison et al. | 428/31 |
| 6,001,208 A | 12/1999 | Kinoshita et al. | 156/245 |
| 6,424,467 B1 | 7/2002 | Goggins | 359/626 |
| 6,490,092 B1 | 12/2002 | Goggins | 359/619 |
| 6,490,093 B2 | 12/2002 | Guest | 359/619 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | 0 410 708 A2 | 7/1990 | | B29C/45/14 |
| EP | 0 502 672 A2 | 2/1992 | | B29C/45/14 |
| EP | 0 615 827 A1 | 9/1994 | | B29C/45/14 |
| JP | 5-112351 | * 5/1993 | | |

* cited by examiner

*Primary Examiner*—Mathieu D. Vargot
(74) *Attorney, Agent, or Firm*—Whyte Hirschboeck Dudek SC

(57) **ABSTRACT**

Disclosed herein is a molded article bearing a lenticular image on its surface that is prepared by a method comprising the steps of:

A. providing a mold in which to form the molded article;

B. inserting a lenticular image into the mold;

C. introducing a molten plastic into the mold to form the molded article with the lenticular image attached to a surface of the molded article; and

D. removing the molded article with the attached lenticular image from the mold.

**16 Claims, 5 Drawing Sheets**





FIG. 1



FIG. 2a



FIG. 2b



FIG. 2c



FIG. 2d



FIG. 3a

FIG. 3b

FIG. 3c

FIG. 3d

FIG. 4

FIG. 5

FIG. 9



FIG. 6



FIG. 7



FIG. 8



FIG. 10

FIG. 11

FIG. 12

FIG. 13

US 6,635,196 B1

1

## MOLDED ARTICLES HAVING A SURFACE BEARING A LENTICULAR IMAGE

This application claims the benefit of Provisional application No. 60/211,112 filed Jun. 12, 2000.

### BACKGROUND OF THE INVENTION

The present invention relates generally to molded articles. In one aspect, the invention comprises molded articles bearing a surface image while in another aspect, the invention relates to molded articles bearing a lenticular image. In yet another aspect, the invention pertains to a method of making molded articles bearing an image, and more particularly, a lenticular image.

Molded articles and their methods of manufacture are well known in the art. Typically, these articles are molded from any one of a number of common plastics, e.g., ABS, acrylic, polystyrene, polyethylene, polypropylene, PET, nylon, polycarbonate, and the like, and these articles are molded into any one of a host of different sizes and shapes, e.g., telephone, compact disc and cosmetic cases, cups, bottles, promotional items, automobile and appliance parts, etc. These products are molded or shaped by any one of a number of different processes, e.g., injection molding, resin transfer molding, blow molding, pressure molding, and the like. Such parts can be complex, that is, comprising more than one injection molded part. For example, a cosmetic case can include an opaque portion and a separately or even simultaneously molded clear portion.

The aesthetic quality of a molded plastic part is, of course, dependent in large part upon its ultimate use. For those products that are used in applications in which their use is not visible to an end user, e.g., fasteners, plugs, etc., the aesthetics of the product are of little, if any, importance. For those products that are used in applications in which their use is visible to an end user, or in which their appearance is important to their sale, e.g., promotional items, automobile and appliance facie, cups, bottles, bottle caps/enclosures, snowboards or wake boards, skis (e.g., water, snow), cameras, computer cases (e.g., laptop cases), cell phone (or other electronic) cases, cosmetic cases, collectibles, signs, magnets, coasters, display posters, menu boards, postcards, business cards, and packaging on boxes, the aesthetics of the product are important.

One way to improve the look of a product is to incorporate into it bright color schemes and fancy or even glitzy decor so as to attract and keep a viewer's attention. The application of a lenticular image is one form of such a decor. As here used, a "lenticular image" means a segmented image comprising two or more component images, the segments interlaced in any conventional manner, and mapped (i.e., aligned) to a lenticular lens. In general, lenticular imaging is known, commercially available and described in U.S. Pat. Nos. 5,113,213; 5,266,995; 5,488,451; 5,617,178; 5,847,808; 5,896,230 and 5,967,032 (all of which are incorporated herein by reference), and U.S. application Ser. No. 09/536246.

The incorporation of a decorative surface feature into a molded product is known, e.g., U.S. Pat. Nos. 5,514,427; 5,985,198; 5,972,279; 5,968,444; 5,951,939; 4,906,315; 4,668,558; 4,582,885; 4,576,850 and Re. 36,457 (all of which are incorporated herein by reference).

In general, molded parts are used in a variety of applications and lenticular images provide an attractive and eye-catching way to improve the overall aesthetic appeal of an object to the viewer. Current technology provides for injec-

2

tion molding of colored plastics and plastics which can incorporate such decorative features as, for instance, a "sparkle."

A method for manufacturing a molded article having a decorative surface layer comprising a lenticular image is of interest to the injection molding industry as well as consumers of molded products in general in that it can provide a product that is simply more beautiful or attractive. On another level, the product can be used to communicate a message (inanimate though it may be) via the decorative lenticular image. A method that can promote the integrity of the lenticular image and the lenticular image's adhesion to the molded article while also protecting the optical properties achieved by the lenticular lens surface is desirable.

### SUMMARY

According to this invention, a molded article bearing a lenticular image is prepared by an in-mold method comprising the steps of:

A. providing a mold in which to form a molded article;

B. inserting a lenticular image into the mold;

C. introducing a molten plastic into the mold to form the molded article with the lenticular image attached to a surface of the molded article; and

D. removing the molded article with the attached lenticular image from the mold.

In one embodiment of this invention, the molded article is formed by an in-mold method of injection molding in which the lenticular image is placed on the surface of one or both halves of the mold and held in place with a vacuum assist, the molten plastic injected into the mold to create the molded article with the lenticular image attached to the surface of the article, and the mold subsequently opened and the finished article removed.

In another embodiment of this invention, the lenticular image bears a coating over the segmented, interlaced and mapped image that protects the integrity of the image from distortion and/or degradation that would otherwise result from the heat and pressure of the molten plastic during the molding process. In other embodiments of this invention, the temperature and pressure of the molten plastic is selected and/or controlled, and/or the gate placement is selected, such that the integrity of the lenticular image remains undistorted without the need for a protective coating.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a flow chart illustrating one method of making a molded article with a surface bearing a lenticular image.

FIGS. 2a–d are cross-sectional views of typical lenticular images.

FIG. 3a shows a robotic arm picking or grasping a typical lenticular image from a stack prior to placing the lenticular image into a typical mold, the mold shown in an open position.

FIG. 3b shows a robotic arm placing a exemplary lenticular image into position within a mold, the mold in an open position, prior to the introduction of molten plastic into the mold.

FIG. 3c shows a lenticular image placed within a mold, the mold having a moveable portion and a stationary portion, the moveable portion of the mold moved so that the mold is in a closed position, and molten plastic having been introduced into the mold.

FIG. 3d shows a robotic arm removing a molded article from a mold that is in an open position, the molded article

US 6,635,196 B1

3

comprising a lenticular image that has been joined with a molten plastic material that has hardened.

FIG. 4 shows a typical lenticular image joined to an optional layer, the optional layer comprising a protective coating or substrate material.

FIG. 5 shows a typical lenticular image having a coating layer and joined to an optional layer comprising, for instance, a substrate material.

FIG. 6 shows an enlarged version of the lenticular image having an optional layer comprising a protective coating or substrate material disposed within a mold, the view taken along line 6—6 of FIG. 3c. A molten plastic material is shown being introduced using arrows via a typical hook gate arrangement.

FIG. 7 shows a lenticular image having an optional layer comprising a protective coating or substrate material disposed within a mold. A molten plastic material is shown being introduced using arrows via a typical sub gate arrangement.

FIG. 8 shows a lenticular image having an optional layer comprising a protective coating or substrate material disposed within a mold. A molten plastic material is shown being introduced using arrows via a typical edge gate arrangement.

FIG. 9 shows an enlarged cross-sectional view of a molded article.

FIG. 10 shows one embodiment of a molded article bearing a lenticular image.

FIG. 11 shows a cross-sectional view of a mold for making the molded article bearing a lenticular image of FIG. 10. A molten plastic material is shown being introduced into the mold using arrows and via a typical gate arrangement. Inside the mold is a lenticular image

FIG. 12 shows a cross-sectional view of the mold taken along line 12—12 of FIG. 11.

FIG. 13 shows a cross-sectional view of the mold taken along line 13—13 of FIG. 11.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The preparation of lenticular images is well known in the art. The lenticular image is, by definition, a composite of two or more component images that are preferably of photographic quality. The component images are selected based upon the desired features of the lenticular or final image. The component images are then arranged, segmented, interlaced and mapped to correspond with the lenticular lens in any convenient manner, e.g., such as those taught in U.S. Pat. Nos. 5,488,451; 5,617,178; 5,847,808 and 5,896,230 all of which are incorporated herein by reference. "Correspondence" between an interlaced image and a lenticular lens is achieved when the interlaced image can be viewed properly through the lenticular lens and the viewer perceives the desired visual effect (e.g., motion and/or depth). The image can be printed directly to the flat back surface of a lenticular lens, e.g., such as that taught in U.S. Pat. No. 5,457,515 (which is incorporated herein by reference), or to a substrate (e.g. paper, synthetic paper, plastic, glass, metal or wood) that can be subsequently joined to the lens.

Lenticular lenses typically take the form of a sheet or web. The sheet includes an array of identical curved surfaces that are formed (e.g., embossed, cast, or extruded) on the front surface of a plastic sheet, and the back surface of the lens is typically flat. Each individual lens or lenticule is a section of a long cylinder that typically extends over the full length of

4

the underlying image. The image can be printed directly to the flat back surface of the lens, or alternatively, the lens can be laminated to the image. The lenticular lens is generally selected to accommodate both the image and the distance from which the image will ordinarily be viewed.

Other factors to consider when selecting a lenticular lens include: the lens sheet thickness, its flexibility and, of course, the cost of the lens material. For a large application, such as a snowboard surface, a thick, coarser lenticular lens is usually preferred. For smaller applications, for example, a cup, key chain, necklace charm, or cosmetic or compact disc case, a thin, finer lenticular lens may be preferred. Coarse lenticular lenses have fewer lenticules per linear inch than fine lenticular lenses. The front (i.e., the surface having the identically curved surfaces) can include a protective layer. Alternatively, a "slip sheet" can be used. In either case, the layer or slip sheet can be removed once the lens is shipped from a manufacturer (i.e., an extruder) to an end user.

Shown in FIGS. 2a–d (and similarly, in FIGS. 4 and 5) are cross-sectional views of a few of the various embodiments of a typical lenticular image 10a for use in the present invention. As shown in FIG. 2a, below and adjacent to flat backside 12a of lenticular lens 12, and typically printed upon it, is an image 14 (preferably comprising the interlaced image described above). An optional coating (also called "floodcoating",or "spotcoating") 16, such as a vinyl plastic or opaque white ink can also be applied to enhance, or provide contrast for, the image. This coating can also be used to provide a special effect, for example, a glow-in-the-dark effect. Such an optional coating is described in U.S. Pat. No. 5,896,230, incorporated by reference above.

A coating, such as coating 16, can also serve to protect the lenticular image, (i.e., the lenticular lens itself, the underlying interlaced image, or both). By way of example, the coating can effectively reduce distortion of the image and/or other degradation (e.g., melting of the lenticular lens) that may result from exposure to excessive pressure and/or heat that may be present during a molding process. One such coating, a "silk screen" coating, is disclosed below with reference to a specific embodiment of the invention.

FIG. 2b shows another embodiment of the present invention in which coating 16 (e.g., a clear coating) is applied below and adjacent to flat backside 12a of lenticular lens 12 and image 14 is printed on the coating. Additionally, an optional layer 18 is shown, the layer comprising a substrate or other coating. As described above, this layer can be included to protect the image, for instance, from heat, pressure, and/or turbulence of molten plastic flow.

FIGS. 2c–d illustrate two ways in which an adhesive can be applied to the lenticular image 10a. In FIG. 2c, adhesive 20 is applied below and adjacent flat backside 12a of the lenticular lens 12. In this example, image 14 is first printed to substrate 22 and affixed to the lens using the adhesive. As a practical matter, the substrate can be made of wood, metal, glass, or plastic, and the adhesive can be any adhesive compatible with the substrate, coating and/or ink of the segmented and interlaced image. Finally, in FIG. 2d, image 14 is printed to flat back surface 12a of lens 12. The image is affixed using adhesive 20 to layer 18 (again, a substrate or coating).

FIG. 4 illustrates another cross-sectional view, similar to that of FIGS. 2a–d, of a typical lenticular image 10a comprising a lenticular lens 12, an image layer 14 and having an optional layer 18 comprising a protective layer or substrate. FIG. 5 shows a typical lenticular image 10a

having lens layer 12, an image layer 14, with a protective coating layer 16, and an optional layer 18 comprising a coating or substrate material.

The following description of the method of this invention is in the context of an injection molding process. However, the method of this invention is also applicable to other molding processes, such as: flash molding, positive pressure molding, transfer resin molding, and blow molding and others.

Injection molding provides an economical and rapid way to produce high quality precision parts (for example, containers such as a cup or computer case, or for a laptop computer) from a wide variety of plastic materials. Representative of these materials are: polyvinyl chloride, polycarbonate, polystyrene, polyethylene, polypropylene, ABS rubbers, polyethylene terephthalate glycol, acrylic, nylon and RIM urethanes. Polyolefins, homopolymers and co-polymers (ionomers, etc.) are also inexpensive thermoplastic resins that have excellent molding properties and are mentioned here as potentially suitable for use. Additionally, certain thermoplastic elastomers, such as the TPO's (thermoplastic olefin) elastomers, may be employed as desired. Generally, this invention can be viewed as applicable to a variety of molten, solidifyable materials, which, besides plastic, might include materials such as glass. For purposes of the present invention, and as a practical matter, conventional molding equipment may be used and, although not shown, is known to those of skill in the art of molding.

In general, plastic granules or pellets are heated until melted, (the melting temperature a function of the plastic, among other things, but typically between about 200 to 500 F). Once melted, the plastic is forced under high pressure (e.g. 10,000 pounds per square inch or more) into a rigid mold press. The mold press is often made of a metal such as aluminum or steel. Once the mold is filled, the molten plastic cools and resolidifies, producing a part with the desired shape and appropriate dimensions.

Referring to FIGS. 3a–d and FIGS. 6–8, typically a mold 31 comprises a stationary portion 32 and a movable portion 34, the moveable portion capable of being moved from an open position (shown in FIGS. 3a–b) to a closed position (FIGS. 3c–d) having a cavity with a surface 35. At least one of the halves can be equipped with one or more runners or channels for delivering a molten plastic to the cavity via at least one injection gate (FIGS. 6–8, numbers 38a–c, described below). A vacuum assist (or some other means, for instance, static electricity, gravity or tension of the material itself) can be used to hold a part in place, (one such part being a lenticular image of the kind described herein). The injection gates are preferably sized to accommodate the part that is to be manufactured. Such aspects of the present invention (i.e., the size and placement of various items, for instance, the runners and gates) can be determined by those of skill in the art of injection molding.

Referring to FIGS. 6–8, a variety of gate types can be employed to provide molten plastic to the mold in a fashion that reduces deterioration or degradation to the lenticular image (such as, for example, melting of the lenticular lens material, or distortion to the interlaced image itself). These include, but are not limited to, hook gates, edge gates and sub gates. "Hook" gates (for example, a "banana" or "j" hook gate) refer to those gates that provide for molten plastic to flow into the mold cavity generally directly behind (or beneath) the lenticular image (e.g., a side opposite the lenticular lens). A typical hook gate 38a arrangement is shown in FIG. 6.

A typical edge gate 38c arrangement is shown in FIG. 8. "Edge" gates, as used herein, generally refer to those gates that can permit the flow of molten plastic along (or at a seam or gap between) the stationary half and the moveable core.

FIG. 7 shows a typical sub gate 38b arrangement. In this application, "sub" gates refer to those gates that provide molten plastic to be angled away from the image surface (or surface and protective layer) such that the plastic can be injected off of, for instance, the moveable core prior to joining molten plastic with the surface of the lenticular image opposite the lenticular lens. Thus, sub gates can substantially reduce direct contact (or impingement) of molten plastic with the side of the lenticular image bearing the interlaced image.

As such, sub gates are typically preferred to hook gates and edge gates since they provide the needed time for the temperature of molten plastic to decrease prior to contacting the lenticular image (or other backing surface). This, in turn, reduces the potential for deleterious effects on the lenticular image (again, either the lenticular lens itself, the printed interlaced image, or both) due to excessive temperature. In addition, sub gates provide a way to inject molten plastic in a manner that can exert a more controlled and less turbulent flow of molten material along the back surface of the lenticular image.

In alternative embodiments of this invention, the mold is equipped with two or more injection gates, and the placement of the gates (also called ports) can vary to convenience. In certain circumstances, the ports are placed distal or oblique to the lenticular image so as to minimize any distortion or other deleterious effects (e.g., burning) of the image or the lenticular lens itself (e.g., melting) that may result from the heat and/or pressure of the molten plastic.

Referring to FIGS. 3a–d, in operation, the two halves of the mold begin in an open position, i.e., extended apart from one another. In a preferred embodiment of this invention, a plurality of appropriately sized lenticular images (preferably the images are die cut or similarly portioned from larger sheets) are delivered to an area near the mold in a stack 10 (or alternatively, on a tape), as shown in FIG. 3a. The images can then be removed individually from the stack (or tape) and placed within the mold through a pick-and-place motion of a robotic arm 40.

Referring to FIGS. 3a–c, lenticular image 10a is positioned within stationary portion 32 (or alternatively, on moveable core portion 34) and held in place through the action of vacuum assist (or optionally, static electricity—separately or in addition to the vacuum assist—can be used to promote positioning of the lenticular image within the mold). The lenticular image is preferably oriented within the mold such that the lenticular lens is positioned between the interlaced image (which is typically attached to the lens itself as described previously) and the surface of mold half 32 (or the surface of moveable core 34), which is preferably polished. Moveable core portion 34 (also preferably having a polished surface) is then closed (shown in FIG. 3c) upon stationary portion 32, leaving a cavity or gap between the surface of the stationary portion and the core portion into which molten plastic is injected.

Referring to FIGS. 6–8, the molten solidifyable material, i.e., the plastic, is injected (via a variety of gate arrangements, e.g., hook, edge, or sub) in a manner as illustrated by the respective arrows of each Figure. The temperature and pressure are sufficient to ensure proper formation of the molded part without distortion of the lenticular image. Of course, the working temperature and

7

pressure of the molten plastic is a function of a number of variables, e.g., the composition of the plastic, the composition and structure of the lenticular image, etc., but as a practical matter, the temperature and pressure experienced by the surface of the lenticular image exposed to the plastic (e.g., ink, protective coating, substrate, etc.) is sufficiently below that at which the surface deteriorates or otherwise degrades.

As the molten plastic material flows between stationary mold 32 and moveable core 34, it pushes the lenticular part against the stationary mold cavity surface. Thus, a pressure is created by the molten plastic flowing into the mold that exerts a force on the lenticular lens. The lens surface is pushed up against the stationary half, holding it in place. Further, the pressure to promotes better adhesion between the molten plastic and the lenticular part. This action (not shown), coupled with the vacuum assist (or, for example, static electricity), prevents any substantial molten plastic material from flowing between the cavity surface and the decorative surface containing the lenticular lens material.

The mold halves are then cooled. Of course, mold temperatures must be selected such that the molten plastic does not unacceptably degrade the lenticular image, and in particular, the optical properties promoted by the curved surface of the lens. Additionally, the temperature must accommodate the plastic so as to permit it to set sufficiently such that lenticular image is permanently affixed to the surface of the injection molded article.

Referring to FIG. 3d, once adhesion is achieved and the plastic set and cooled, mold portions 32 and 34 can be separated. The vacuum assist can be disengaged, and the molded article bearing the lenticular image can then be removed using robotic arm 40.

FIG. 9 shows an enlarged cross-sectional view of a molded article 50 bearing a lenticular image 10a. The multiple layers shown in FIGS. 6–9 generally correspond to those layers described above with reference to FIGS. 2a–d and FIGS. 4–5.

FIG. 10 illustrates an injection molded product (i.e., a cup) 60 made in accordance with an embodiment of the present invention, the product having attached to it (or otherwise bearing) lenticular image 70 which itself comprises a plurality of individual elements or images (i.e. fish) 70a, 70b, and 70c, etc. One such cup has at its top end an open, circular, upper diameter of about 3.50 inches, and at its bottom end a smaller, circular diameter of about 2.25 inches, with a frustoconical sidewall depending between the open top and bottom. The cup has a height of about 6 inches. Lenticular image 70 can typically be produced as a lenticular part 10a of the kind described above (e.g., FIGS. 3a–3c). In this case, the part is typically produced and sized as a flat piece that is shaped to accommodate a curved surface of the cup (e.g., as a sleeve). The part can be sized and shaped to cover substantially the entire outer surface of the finished cup, or a portion thereof (e.g., a "belly band"). The lenticular part can be positioned along the inner surface of such a cup as well.

Referring next to FIG. 11, a cross-sectional view of a mold 80 is shown, the mold comprising mold portions 80a and 80b (one of which can be moveable and the other stationary as described above). The mold shown can be used to make the molded product 60 bearing a lenticular image (of FIG. 10). Molten plastic material is shown being introduced into the mold using arrows and via a typical gate arrangement 90 (also shown in FIG. 12). Inside the mold is lenticular image 70. Again, image 70 is typically produced

8

as a part 10a and as shown in FIGS. 3a–3c. Thus, it is noted that image 70 can have various layers as in FIGS. 3a–3c, but, for clarity and simplicity, these layers are not shown in FIG. 11 (or, for that matter, in FIGS. 12 and 13).

FIGS. 12 and 13 show cross-sectional views of the mold 80 (in FIG. 12, only mold portion 80b is shown) taken along lines 12—12 and 13—13 of FIG. 11, respectively. Lenticular image 70 is also shown (again, without layering). The width of the mold cavity between mold sections 80a and 80b can be clearly viewed in addition to lenticular part 70. Gate 90, through which molten plastic can be injected into the cavity, can also be seen (FIG. 12).

Referring again to FIG. 11, to make the cup bearing a lenticular image 70, plastic can be injected in an indirect fashion, meaning that the plastic is not injected to immediately come in contact with or come up against the lenticular image part. Rather, the molten plastic is first channeled into the mold at a distance from the lenticular image, the distance in this case roughly equal to the radius of the base of the cup. Thus, a surface that does not require decoration (e.g., a lenticular image), such as the bottom of a cup (as is the case here), can be utilized to effectively minimize deleterious effects to the lenticular image. Here, the lenticular image is placed in the mold cavity so as to extend substantially only over what will become the frustoconical sidewall of the finished cup. Using a design such as this, heat and pressure associated the molten plastic can be controlled to a greater extent, and thus, the molten plastic is prevented from harming the lenticular image.

As a practical matter, the placement, including any angling, of any gate(s) tend(s) to be of greater importance than the selection of any particular type of gate (e.g., sub, hook, edge). Gates can be positioned or angled to channel the molten plastic into the mold at a distance from the lenticular image. This, in turn, can serve to protect the image since, as mentioned previously, the heat and pressure of the molten plastic entering the mold can have deleterious effects, both on the image, as well as the lens itself. Also, specific design aspects of the present invention relating to molding technology (i.e., the size, placement and angling of various items, for instance, the runners and gates) can be determined by those of skill in the art of injection molding depending, of course, on the particular project at hand.

Additionally, to ensure proper flow of the molten material (as well as proper temperature, pressure and any associated turbulence of the flow of plastic material), a suitable "mold thickness" must be considered and designed. "Mold thickness" means the annular area in between stationary and moveable mold portions 80a and 80b and more specifically here refers to the width of that section of the mold cavity which ultimately forms the frustoconical sidewall of the cup. To determine an appropriate mold thickness requires accounting not only for the thickness of the end product (i.e., the wall of the cup) but of the lenticular image. In short, the lenticular image (for a typical cup of the kind described here) has a thickness that is not insignificant when compared to the overall mold thickness. In other words, lenticular image has a thickness that cannot be discounted when considering heat, pressure and turbulence of the molten plastic entering the mold cavity.

The pressure and turbulence of water exiting a hose nozzle increases when the cross-sectional area of the hose is decreased. Similarly, the pressure and turbulence of the molten plastic increase as a result of the additional area taken up by the lenticular image part in the mold. Accordingly, mold and product design, as well as gate placement, angling and/or size, must accommodate such factors.

US 6,635,196 B1

9

An example of a molded product that can be made in accordance with the present invention is shown in FIGS. 10–13. A cup is shown having a wall thickness of about 82.5 mils. A typical lenticular image (again, comprising a lens, image layer and perhaps a substrate and/or coating layer(s) as described above with respect to FIGS. 2a–d) has a thickness of about 14.5 mils. Thus, in a mold designed for the production of a plastic cup having wall thickness of about 82.5 mils, molten plastic is actually introduced (through a channel such as the one shown in FIGS. 11 and 12) into a mold having reduced thickness of about 68 mils. This reduced thickness corresponds to the annular thickness of the mold cavity less the thickness of the lenticular part.

In contrast, a typical cellular phone cover having a thickness of about 37.5 mils and a lenticular image of about 14.5 mils would result a reduced mold thickness of about 23 mils and thereby resulting in an increased level of turbulence within the mold cavity. Such turbulence has been found in practice to have deleterious effects on the lenticular image, including for example, distortion of the interlaced image. In fact, this distortion can take the form of melting and reflowing the ink of the printed lenticular image. Thus, it may be necessary to redesign the mold so as to accommodate the part thickness (which includes the thickness of the lenticular image) so as to avoid the destructive effects of turbulence.

The mold cavity is typically filled, or "packed" with the molten plastic so as to produce a complete part or article. Without such packing, a portion of the product (e.g., in this case, the sidewall of the cup) may not form properly and/or completely. For any given mold (again, a mold cavity can take varying shapes and contours, as well as utilize a variety of channeling and gate arrangements) and any given type of plastic (e.g., polystyrene) that can be used, a specific quantity "x" of plastic is injected. This quantity is known in the art of injection molding as a "shot" of molten plastic.

The process of "packing" the mold cavity is monitored and controlled here with respect to lenticular to a greater extent when compared with other, nonlenticular molding applications. There is a range, or "window" of quantities of molten plastic that can work to produce a proper, final, complete part, and this range is narrower for lenticular applications when compared to nonlenticualr applications. When a mold is packed too little, that is, with a quantity molten material that is less than "x",it is said to be "short-shot" and/or underfilled. "Short-shooting" typically results in an unfilled mold cavity, and typically, an incomplete part. When a mold is packed too much, it is said to be "over-packed" or filled with a quantity of plastic that is greater than "x". "Over-packing" can result in flattening or distortion of the lenticules of the lenticular lens. Such distortion of the lens can ultimately result in degradation of the underlying image when the image is viewed through the lens. In essence, a balance be must be achieved between "short-shooting" and "over-packing" the mold to produce a complete final injection molded article with a lenticular image attached properly thereto.

Finally, lenticular image 70 (FIGS. 10–13), as described earlier, can preferably include a coating (such as flood coat and other coatings referenced briefly above) to protect the image from the heat and pressure of the molten plastic. In addition, it has been found that, when properly selected, the coating can also accomplish an improved adhesion between the molten plastic and the lenticular image part. One coating that is suitable for use in this invention and which achieves at least these stated benefits is "PLASTIJET XG",a solvent evaporative "silk" screen ink, available from Sericol, Inc., of North Kansas City, Mo. It is also noted here that the image

10

underlying the lenticular lens (the image that can impart an effect such as multidimensionality and/or motion) can itself be printed using the "silk" screen ink, and in doing so, eliminate the need for the separate step of flood-coating the lenticular image.

In an alternative embodiment of the present invention, the lenticular lens of the lenticular image is made in situ. In this embodiment, at least one surface or at least one part of one surface of one of the mold halves is shaped to impart a lenticular lens configuration to a portion of the surface of the molded article. In this embodiment, the image (e.g., an interlaced image suitable for creating the illusion of motion and/or depth), typically printed upon a suitable substrate, is positioned over the part of the mold shaped to impart a lenticular lens configuration to the molded article. Significantly, the image is mapped to the lenticules of the lens. The method as described above is then performed.

It is to be understood that the detailed description (and accompanying drawings) relating to a cup having a frusto-conical cup is provided by way of example only, and is not to be construed in a limited sense with respect to this invention. Indeed, molded articles that can be made by the method of this invention include such diverse items as: containers (for example, cups, bottles, etc.), key chains, necklaces, charms, automobile dashboards, cosmetic or compact disc cases, among others, including those listed above.

The present invention has been described in terms of preferred embodiments. Equivalents, alternatives, and modifications, aside from those expressly stated herein, are possible and are within the scope of the appending claims.

What is claimed is:

1. A method for making a molded article having a lenticular image attached thereto, the method comprising the steps of:

A. providing a mold having a mold cavity in which to form the molded article having a lenticular image, the lenticular image comprising a lenticular lens and interlaced image, the mold cavity having a size that is appropriate to the molded article with the lenticular image;

B. inserting the lenticular image into the mold cavity;

C. introducing a molten plastic into the mold cavity having the lenticular image therein to form the molded article with the lenticular image attached thereto, the molten plastic introduced at least one of a temperature, a pressure, and a turbulence that minimizes any distortion to the lenticular lens and any degradation to the interlaced image; and

D. removing the molded article having the attached lenticular image from the mold cavity.

2. The method of claim 1 further comprising the step of delivering a plurality of lenticular images to an area near the mold and inserting at least one of the plurality of lenticular images into the mold using a robotic arm.

3. The method of claim 1 in which the mold has an open cavity defined by a surface and the lenticular image, the lenticular image comprising a lens and an interlaced image, is oriented within the mold cavity such that the lens is positioned along at least part of the cavity surface.

4. The method of claim 1 wherein the lenticular image has a thickness that is not insignificant with respect to the size mold cavity.

5. The method of claim 1 wherein the molten plastic is introduced in a shot size quantity that packs the mold so as to result in little, if any, of at least one of distortion to the lenticular lens and degradation to the underlying image.

11

6. The method of claim 1 in which the lenticular image further included at least one of a substrate, an adhesive, and a coating.

7. The method of claim 6 in which the substrate comprises one of: paper, synthetic paper, plastic, metal, glass, or wood.

8. A method for making a molded article having a lenticular image attached thereto, the method comprising the steps of:

A. providing a mold having a cavity in which to form the molded article having a lenticular image, the lenticular image comprising a lenticular lens and interlaced image, at least one part of one surface of the mold cavity shaped to impart a lenticular lens to a portion of the at least one surface of the molded article, the mold cavity having a size that is appropriate for the molded article with the lenticular image attached thereto;

B. inserting an interlaced image into the mold cavity, the image positioned over the surface of the mold cavity that is shaped to impart the lenticular lens;

C. introducing at least one type of molten plastic into the mold cavity to form both the molded article and the lenticular lens comprising lenticules on at least part of the at least one surface of the molded article, the interlaced image positioned to correspond to the lenticules of the lens, thereby forming a lenticular image, one of the at least one type of molten plastic introduced at least one of a temperature, a pressure and a turbulence that minimizes any distortion to the lenticular lens and any degradation to the interlaced image; and

D. removing the molded article having the attached lenticular image from the mold.

9. The method of claim 1 wherein the interlaced image is printed directly to the lenticular lens.

10. The method of claim 1 wherein the lenticular image is held in place along the cavity surface.

11. The method of claim 1 further comprising the step of cooling the molded article, the article comprising the attached lenticular image, so as to create a finished molded article.

12. A method for making a molded article having a lenticular image integral therewith, the method comprising the step of:

providing a mold having a cavity in which to form the molded article having the lenticular image, the mold cavity having a size that is appropriate to the molded article with the integral lenticular image;

inserting an lenticular image into the mold cavity, the lenticular image comprising a lenticular lens and an interlaced image;

introducing a molten plastic into the mold cavity having the lenticular image therein to form the molded article with the integral lenticular image, the molten plastic introduced at least one of temperature, a pressure, and

12

a turbulence that minimizes any distortion to the lenticular lens and any degradation to the interlaced image; and

cooling the molten plastic such that the plastic and the lenticular image form the molded article having the lenticular image integral therewith; and

removing the molded article having the integral lenticular image from the mold cavity.

13. The method of claim 12 further comprising introducing the molten plastic into the mold cavity using lenticular image specific gating to form the molded article having the integral lenticular image.

14. The method of claim 13 wherein the introducing step includes packing the mold cavity with molten plastic so as to minimize distortion of the lenticular lens.

15. An in-mold method for making a molded article having an integral lenticular image, the method comprising the step of:

providing a mold having a mold cavity in which to form the molded article having the lenticular image, the lenticular image comprising a lenticular lens and an interlaced image, the mole cavity having a size that is appropriate to the molded article having the lenticular image;

inserting an interlaced image into the mold, the image positioned over at least a portion of a surface of the mold cavity that is shaped to impart the lenticular lens configuration;

introducing at least one type of molten plastic into the mold cavity with the inserted interlaced image;

imparting, with the mold cavity surface portion, the lenticular lens configuration to at least a portion of the at least one type of molten plastic, the interlaced image positioned to correspond to the lenticular configuration, thereby forming the lenticular image;

forming, in the mold cavity a molded article having the lenticular image integral therewith,

cooling the at least one type of molten plastic to form the molded article having the integral lenticular image; and

removing the molded article having the integral lenticular image from the mold cavity; wherein one of the at least one type of molten plastic is introduced at least one of a temperature, a pressure, and a turbulence that minimizes any distortion to the lenticular lens and any degradation to the interlaced image in the mold cavity.

16. The method of claim 15 further comprising introducing the molten plastic into the mold cavity with lenticular specific gating to form the molded article with the integral lenticular image, thereby accommodating the lenticular image.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,635,196 B1                                      Page 1 of 1
DATED         : October 21, 2003
INVENTOR(S)   : Timothy P. Goggins

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 10,
Line 36, delete "A."
Line 42, delete "B."
Line 43, delete "C."
Line 46, replace "at" with -- at at --.
Line 50, delete "D."

Column 11,
Line 2, replace -- included -- with "includes".
Line 9, delete "A."
Line 17, delete "B."
Line 20, delete "C."
Line 27, replace "at" with -- at at --.
Line 30, delete "D."
Line 43, replace "step" with -- steps --.
Line 44, insert -- mold -- after the second occurrence of "a" and before "cavity".
Line 48, replace "an" with -- a --.
Line 54, insert -- a -- before "temperature".

Column 12,
Line 19, replace "step" with -- steps --.
Line 23, replace "mole" with -- mold --.
Line 44, replace "at" with -- at at --.

Signed and Sealed this

Twelfth Day of October, 2004

*Jon W. Dudas*

_____

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**DYNAMIC DRINKWARE, LLC**
**Petitioner/Appellant**

**v.**

**NATIONAL GRAPHICS, INC.**
**Patent Owner/Appellee**

**Proceeding No:  IPR2013-00131**

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the

Federal Circuit was timely filed on November 10, 2014, in the United States

Patent and Trademark Office in connection with the above identified *Inter*

*Partes* Review (IPR) proceeding.  Pursuant to 35 U.S.C. § 143 a Certified

List is this day being forwarded to the Federal Circuit.

December 22, 2014                         Respectfully submitted,

                                          Under Secretary of Commerce for Intellectual
                                          Property and Director of the United States
                                          Patent and Trademark Office

                         By: *Laura J. Peterson*
                                          Laura J. Peterson
                                          Paralegal Specialist
                                          Mail Stop 8, P.O. Box 1450
                                          Alexandria, Virginia 22313-1450
                                          571-272-9035

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the

foregoing has been served on Appellant and Appellee this 22nd day of

December, 2014, as follows:

Joseph S. Heino
Davis & Kuelthau, S.C.
jheino@dkattorneys.com

Michael T. Griggs
Boyle Frederickson, S.C.
mtg@boylefred.com

Laura J. Peterson
Paralegal Specialist
U.S. Patent & Trademark Office
Office of the Solicitor
P.O. Box 1450
Alexandria, VA  22313

**5 U.S.C. 706**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**35 U.S.C. § 102(e)(2)**
"A person shall be entitled to a patent unless ... the invention was described in ... a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent .... "

**35 U.S.C. § 111(b)(8)**
"The provisions of this title relating to applications for patent shall apply to provisional applications for patent, except as otherwise provided, and except that provisional applications for patent shall not be subject to sections 115, 131, 135 and 157 of this title."

**35 U.S.C. §112 ¶1**
The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact

terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

**35 U.S.C. § 119(e)(1)**
"An application for patent filed under section 111(a) ... for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in a provisional application filed under section 111(b) of this title ... shall have the same effect, as to such invention, as though filed on the date of the provisional application filed under section 111(b) of this title, if the application for patent filed under section 111(a) ... is filed not later than 12 months after the date on which the provisional application was filed ...."